331 F.Supp. 257 (1971)
Shirley J. LINDSAY, Executrix of the Estate of John Douglas Lindsay, Deceased, Plaintiff,
v.
McDONNELL DOUGLAS AIRCRAFT CORPORATION, a corporation, Defendant.
No. 68 C 354(1).
United States District Court, E. D. Missouri, E. D.
April 26, 1971.
Gray & Friedman, St. Louis, Mo., for plaintiff.
R. E. Keaney and M. E. Stokes, Moser, Marsalek, Carpenter, Cleary & Jackel, St. Louis, Mo., for defendant.

MEMORANDUM
MEREDITH, Chief Judge.
This suit is in admiralty, based upon the Death on the High Seas Act, 46 U.S. C. § 761 et seq., which arose out of the crash of an F4B aircraft in the Gulf of Mexico off Key West, Florida, on August 5, 1966, killing the pilot and the radar intercept officer. Libelant, in her representative capacity, seeks to recover damages for the wrongful death of John Douglas Lindsay, the pilot from McDonnell Douglas Aircraft Corporation, the manufacturer of the airplane, claiming that a defect in the construction of the aircraft and the negligence of the defendant in the manufacture of the aircraft caused the crash.
The F4B aircraft, Bureau No. 153038, was built by defendant and sold as a new aircraft to the United States Navy on August 3, 1966, in St. Louis, Missouri. The plane was flown by a Navy pilot to the Naval Air Station in Key West, Florida. Following the arrival at Key West, the plane was given a standard acceptance check. A moisture separator and a pneumatic air compressor were installed in the aircraft by the Navy before the fatal crash.
*258 At the time of the crash Commander Lindsay and Radar Intercept Officer Lieutenant Herman E. Roy were engaged in a night air intercept training flight, flying the F4B-153038. This exercise consists of two phases. The first phase is a forward hemisphere attack on the target aircraft and the second is the rear attack, known as the re-attack. This pattern of attack is tailored to the F4B and its weapons system. The pilot-radar intercept officer team maneuver the aircraft to firing position ahead of the target aircraft and release the forward Sparrow 111 missile, which is fired initially in a relatively head-on approach. Completion of the first phase attack is signaled by a "Fox-1" tone. The re-attack is commenced immediately after the "Fox-1" tone by making a hard turn to the reciprocal of the target heading and reversing the turn in the opposite direction so as to turn to target and release the rear or "sidewinder" missile.
Lindsay and Roy had completed two such intercepts and were in the second phase of another such intercept with the target aircraft at six thousand feet when radar and radio contact was lost with their aircraft. Major C. F. Wallace and Captain R. J. Charrier piloted the target aircraft. Major Wallace observed the Lindsay aircraft make the initial attack, heard the missile release tone and "Fox-1" called. Re-attack was initiated and Lindsay's plane was observed by Major Wallace to be abeam of the target aircraft at approximately two to three miles, still slightly low. As the Lindsay aircraft passed through the target aircraft's four o'clock position, Wallace observed it at an angle of bank of seventy-five to eighty degrees, at about a mile separation. The aircraft reduced its angle of bank some fifteen to twenty degrees and passed out of sight at the five o'clock position at an estimated one-half to three-quarters of a mile. At the same time, ground radar equipment from Tarpon Control reported a merged plot.
Captain Charrier, co-pilot of the target aircraft, described the Lindsay aircraft as passing abeam at what appeared to him to be a steep angle of bank, differing from the previous passes in that he started his reversal much earlier and passed the five o'clock position in a banked attitude. From this observation, Captain Charrier surmised that the Lindsay plane would overshoot to the seven o'clock position.
The target aircraft continued in its original direction after this pass. Tarpon Control called for a radio check three or four minutes later. Major Wallace acknowledged, but Tarpon received no response from Lindsay. Major Wallace then attempted contact, but again there was no answer. At this point the target aircraft executed a one hundred eighty degree turn and immediately observed an orange color bright light on the water to the north. Upon arriving at the scene, Major Wallace and Captain Charrier observed a ring of fire upon the water. No boats were at the immediate scene, but a shrimp boat was observed by the two men at a distance of approximately three nautical miles from the fire.
Leslie A. High, a shrimp boat captain, and his wife were shrimping approximately forty-five miles west of Key West, Florida, on the evening of the crash. They heard an unusual sound of an aircraft passing over their boat. Captain High described the sound of the engines as laboring and groaning. They went outside and observed the aircraft, which appeared to be burning in the air. They watched it plunge into the water and burn on the water. Captain High estimated that the plane crashed within two or three miles of their location. The weather during this time was fair with a light fog or mist on the water. He described the fire as being round, but couldn't say whether the fire was getting larger or smaller during the period of time he observed it. After the crash of the plane, Captain High immediately called the Coast Guard and proceeded to the scene. No trace of the airplane was found at the scene after he arrived.
Libelant's position is that the failure of the bleed air duct system on the plane *259 was the cause of the crash, that this constituted negligence and breach of warranty on the part of the defendant, because the defendant installed this system in the plane in question knowing it to be faulty. The defendant takes the position that the allegations of negligence and breach of warranty are unsubstantiated by the proof. Defendant affirmatively alleges that pilot John Lindsay's negligence was the proximate cause of the action.
Initially, this Court takes note of basic principles of law applicable to this case. These principles are authoritatively discussed by Judge Matthes in Nicklaus v. Hughes Tool Co., 417 F.2d 983, 986 (8th Cir. 1969). The opinion states as follows:
"A manufacturer has a duty to exercise reasonable skill and care in the design and manufacture of its product, commensurate with the risk of harm flowing from normal use of that product. * * * This duty also binds the manufacturer with respect to component parts incorporated into its final product, but manufactured by another. * * * As a necessary corollary, a manufacturer has an affirmative duty to make such tests and inspections, during and after the process of manufacture, which are commensurate with the dangers involved in the intended use of the product.
"Where, as here, the plaintiff's claim against the manufacturer sounds in both negligence and breach of implied warranty, he must establish by a preponderance of the evidence these basic elements: (1) that the product was defectively designed or manufactured, * * *; (2) that the defect was the proximate cause of the damage complained of, * * *; and (3) that the defect existed at the time the manufacturer parted with possession of the product, * * *. To permit recovery for negligent manufacture, ordinarily plaintiff must show, in addition to lack of reasonable skill and care in the process of manufacture, that the manufacturer failed to make a reasonable inspection or test to discover defects." (Citations omitted)
This brings this Court to the dispositive question of this case, i. e., whether the plaintiff has established by a preponderance of the evidence that the crash was caused by the presence of a defect in the aircraft at the time the plane left the plant of the defendant.
This Court agrees with plaintiff's contention that the facts necessary to sustain a recovery may be established by circumstantial evidence under Missouri law. The only qualification is that the evidence must rise above the stature of guesswork, speculation, and conjecture, and must point to the desired conclusion with such certainty as to make particular conclusion more reasonable and probable than any other that might be drawn. Alexander v. Inland Steel Co., 263 F.2d 314 (8th Cir. 1958).
Expert testimony from several witnesses was heard by this Court in the trial of this case. Evidence was offered by the plaintiff supporting her position that the bleed air duct system was defective and caused the crash of the aircraft. Defendant offered evidence that the crash of the plane was the result of pilot error.
After extensive review of the evidence in this case, this Court finds that the credible evidence establishes no preponderance of evidence by libelant that the F4B aircraft was defectively designed or manufactured; no preponderance of evidence that a defect was the proximate cause of the accident; and lastly, no preponderance of evidence that this unknown defect existed at the time McDonnell Douglas parted with possession of the aircraft. Therefore, judgment will be entered for the defendant.