Shirley J. LINDSAY, Executrix of the Estate of John Douglas Lindsay, Deceased, Appellant,

v.

McDONNELL DOUGLAS AIRCRAFT CORPORATION, a Corporation, Appellee.

No. 71-1545.

United States Court of Appeals, Eighth Circuit.

Submitted March 16, 1972.

Decided May 10, 1972.

Charles E. Gray, C. Marshall Friedman, Gray, Friedman & Ritter, St. Louis, Mo., for appellant.

Robert E. Keaney, Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for appellee.

Before GIBSON, HEANEY and ROSS, Circuit Judges.

GIBSON, Circuit Judge.

This is a suit in admiralty brought under the Death on the High Seas Act, 46 U.S.C. § 761 et seq. The plaintiff, Shirley J. Lindsay, is the executrix of the estate of her husband, John Douglas Lindsay, who met his demise while flying as a naval aviator an F4B jet air-

craft manufactured by defendant McDonnell Douglas Aircraft Corporation (McDonnell). Judgment was entered for the defendant. The District Court held the plaintiff failed to prove by a preponderance of the evidence that the plane crash was caused by a design or manufacturing defect in the aircraft.[1]

The aircraft involved was first flown on July 5, 1966, by a McDonnell test pilot. During the flight the cooling light came on twice indicating an overheating condition. At the second and third flights overheating also occurred. The aircraft was scheduled for delivery to the Navy on August 2, 1966; however, delivery had to be postponed because of the discovery of additional deficiencies. The aircraft was flown by a Navy pilot to Key West Naval Air Station for fleet service on August 4, 1966. The aircraft was given the standard acceptance check and a moisture separator and a pneumatic air compressor were replaced as defective. The next day, August 5, the aircraft crashed, killing Commander Lindsay and Lt. Henry E. Roy, the radar intercept officer.

The flight on August 5 was a night air intercept training mission over the Gulf of Mexico about 75 miles west of Key West, Florida and involved maneuvers which were standard flight procedures within the capabilities of the F4B. Two aircraft were involved in this exercise, a target aircraft and an attacking aircraft. Commander Lindsay piloted the attacking aircraft. The intercept consisted of two phases. The first phase was an attack from the forward hemisphere, in relation to the target aircraft, designed to utilize the F4B's Sparrow III air-to-air missile. When the aircraft was in proper attack position the forward missile was released and its completion was signaled as "Fox-1". This completed the

1. Specifically the District Court found:
"* * * [T]hat the credible evidence establishes no preponderance of evidence by libelant that the F4B aircraft was defectively designed or manufactured; no preponderance of evidence that a defect was the proximate cause

of the accident; and lastly, no preponderance of evidence that this unknown defect existed at the time McDonnell Douglas parted with possession of the aircraft." 331 F.Supp. at 259.
The District Court's memorandum opinion is reported at 331 F.Supp. 257.

first phase. The second phase, the re-attack, was immediately instituted by making a hard turn to the reciprocal of the target's heading and then a reversing turn so as to be behind the target and heading in the same direction. This put the F4B in position for utilization of its rear, or Sidewinder, heat seeking missile.

On the fatal training flight Commander Lindsay had completed two such intercepts and had begun a third. About 42 minutes flying time had elapsed. The first phase of the third intercept had been completed. Maj. C. F. Wallace, the pilot of the target aircraft, observed the Lindsay aircraft initiate a re-attack turn, then reverse at an estimated angle of bank of 75° to 80° which angle of bank was reduced some 15° to 20° when it passed out of sight, apparently in the visual dead space to the rear of the target aircraft, which was flying at 6000 feet; after several minutes the target aircraft tried to initiate radio contact with Commander Lindsay and getting no response made a sharp turn and saw an orange glow on the water at a range of twelve to fourteen miles. Arriving over the scene Major Wallace saw a shrimp boat approaching the crash area from about three nautical miles away.

The captain of the shrimp boat, Leslie High, a frequent observer of military aircraft training missions, testified that he and his wife were in the cabin when he heard an aircraft make a strange noise, described as laboring, groaning or straining. He went outside and saw an airplane on fire. He described the fire as appearing large in relation to the plane and round. He watched the plane's gradual descent into the water where it impacted some two or three miles from his boat. After pulling in his nets he immediately headed toward the site of the crash. When he arrived there was no trace of the aircraft.

Several days later the Navy ran simulated tests over his boat with the afterburners of the jets in operation to determine if this was the fire which Captain High stated he had observed. He described the afterburner on the test aircraft compared to the burning Lindsay aircraft as a lightening bug compared to a bright full moon. The aircraft was never recovered.

A Naval Accident Board report listed the cause of the accident as undetermined but noted that the possibility of a material malfunction warranted strong consideration and viewed material failure as the most possible of three possible causes, pilot disorientation, stall/spin, or material failure.[2]

Plaintiff contends the trial court erred in not applying the doctrine of strict liability in tort as set forth in Restatement (Second) of Torts § 402–A and in failing to make necessary findings of fact pertinent under the strict liability theory. She requests us to make affirmative findings of liability on the record.

2. Pertinent parts of the Report read: "SUMMARY: Cdr Lindsey [sic] and Lt. Roy Launched [sic] on 5 August 1966 to conduct air intercept training. Another aircraft was launched to serve as a target aircraft for them. After a series of successful maneuvers, 153038 turned to acquire a position astern of the target plane. As 153038 passed astern of the target aircraft, radio and radar contact were lost and the aircraft crashed into the sea. "INVESTIGATION AND ANALYSIS: Both the pilot and NFO [sic] were experienced aviators and in excellent health. They had received adequate rest and nourishment prior to the flight.

"The plane was new and had experienced no trouble on the ferry flight. Maintenance procedures were in accordance with stand [sic] operating procedures and are not considered to have had any effect upon the accident. A lack of evidence prohibits a definite statement that a material malfunction occurred, but the possibility warrants strong consideration. "CONCLUSIONS: It is concluded that the cause of the accident is undetermined. Three possible causes exist:
 a. Pilot disorientation
 b. Stall/spin
 d. [sic] Material failure.
Board members consider the later [sic] as most possible."

The defendant responds that the case was not tried under a strict liability theory and that the trial court's findings were adequate to sustain the judgment.

Although the plaintiff introduced evidence attempting to show a defect in the bleed air duct system and considerable emphasis was placed on this evidence, Count I of the complaint did plead a cause of action under strict liability.[3] The parties by agreement tried the case under Missouri law. At oral argument we requested supplemental briefs on whether Missouri or federal law applied under the Death on the High Seas Act, and also if federal law applied, whether the doctrine of strict liability would be applicable.

■■ Clearly, federal maritime law applies as the cause of action is created by federal law and the Act should be applied uniformly in the federal courts with exclusive jurisdiction in admiralty. The courts facing this issue have uniformly held that the Death on the High Seas Act created a federal cause of action in admiralty, where none existed before. The cause of action embraces death caused by wrongful act, neglect or default occurring on the high seas beyond a marine league from the shore of any state and includes air travel over as well as ship travel on the high seas. Petition of the United States, 418 F.2d 264 (1st Cir.1969); D'Aleman v. Pan American World Airways, Inc., 259 F.2d 493 (2d Cir.1958); Trihey v. Transocean Air Lines, Inc., 255 F.2d 824 (9th Cir.), cert. denied, 358 U.S. 838, 79 S.Ct. 62, 3 L.Ed.2d 74 (1958); Noel v. Linea Aeropostal Venezolana, 247 F.2d 677 (2d Cir.) cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957); Turner v. Wilson Line of Massachusetts, 242 F.2d 414 (1st Cir.1957); Higa v. Transocean Airlines, 230 F.2d 780 (9th Cir.), cert. dismissed, 352 U.S. 802, 77 S.Ct. 20, 1 L.Ed.2d 37 (1956); Middleton v. Luckenbach S.S. Co., 70 F.2d 326 (2d Cir.), cert. denied, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934); Pardonnet v. Flying Tiger Line Inc., 233 F.Supp. 683 (N.D.Ill.1964).

■ We further conclude that federal maritime law should and does apply the doctrine of strict liability in tort. Missouri likewise has adopted the doctrine of strict liability in tort, making Missouri law and federal maritime law congruent in this respect.

Missouri adopted the doctrine of strict liability in Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362 (Mo.1969). Even though *Keener* was not handed down until after this complaint had been filed, it clearly sets forth Missouri law on this point, and was forecast by Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo.1963), dispensing with privity on implied warranties.

■■ The rule of strict liability in tort states in Restatement (Second) of Torts § 402–A as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, * * *."

---

3. Paragraph 4 of Count I in pertinent part states:

"The * * * aforesaid fire and the resulting death of John Douglas Lindsay was directly and proximately caused by the design or method of manufacture of said aircraft by defendant. Said aircraft was in a defective and hazardous condition at the time of the sale and delivery * * * and was not reasonably suitable for the uses intended."

Furthermore, contributory negligence as ordinarily applied is not a defense to strict liability. Keener v. Dayton Electric Mfg. Co., *supra* and 46 U.S.C. § 766.

■ The Death on the High Seas Act creates a cause of action for wrongful death, 46 U.S.C. § 761 et seq., in favor of designated survivors for the death of a person "caused by wrongful act, neglect, or default occurring on the high seas" and sets the measure of recovery at a fair and just compensation. Under § 766 contributory negligence is not a defense but the doctrine of comparative negligence is applied in reducing the recovery. Jurisdiction of this action would rest in the federal district courts in admiralty. We feel this federal cause of action must follow general maritime law which in turn incorporates the general law of torts where it is harmonious with admiralty law. Cain v. Alpha S. S. Corp., 35 F.2d 717, 722 (2d Cir.1929), aff'd on other grounds, 281 U.S. 642, 50 S.Ct. 443, 74 L.Ed. 1086 (1930); Warshauer v. Lloyd Sabaudo S. A., 71 F.2d 146, 147 (2d Cir.), cert. denied, 293 U.S. 610, 55 S.Ct. 140, 79 L.Ed. 700 (1934); Sieracki v. Seas Shipping Co., 149 F.2d 98, 100 (3d Cir.1945), aff'd, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

While the doctrine of strict liability in tort (often referred to as doctrine of implied warranty) at its inception did not have the wide acceptance which would justify its incorporation into the general maritime law, Noel v. United Aircraft Corp., 204 F.Supp. 929 (D.Del. 1962), it has gained general acceptance in the intervening years and has been incorporated in admiralty law. Schaeffer v. Michigan-Ohio Navigation Co., 416 F.2d 217 (6th Cir.1969); Ohio Barge Line, Inc. v. Dravo Corp., 326 F. Supp. 863 (W.D.Pa.1971); In re Marine Sulphur Transport Corp., 312 F.Supp. 1081 (S.D.N.Y.1970); Soileau v. Nicklos Drilling Co., 302 F.Supp. 119 (W.D.La. 1969); Krause v. Sud-Aviation, Societe Nationale de Constructions Aeronautiques, 301 F.Supp. 513 (S.D.N.Y.1968), aff'd 413 F.2d 428 (2d Cir.1969).

■ We think now that the doctrine of strict liability in tort is a part of the general maritime law and it is thus available to this plaintiff under the Death on the High Seas Act, which applies federal admiralty law. D'Aleman v. Pan American World Airways, *supra.*

The trial court in its memorandum opinion characterized plaintiff's position as follows:

"Libelant's position is that the failure of the bleed air duct system on the plane was the cause of the crash, that this constituted negligence and breach of warranty on the part of the defendant, because the defendant installed this system in the plane in question knowing it to be faulty." 331 F.Supp. at 258.

We are not concerned particularly about the labels of negligence and breach of warranty in this action and note that strict liability in tort is often referred to by other names as "products liability", *see* Hursh, American Law of Products Liability, and, in its beginnings, it often had the label of breach of implied warranty. *See*, Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960).

■ Initially we will refer to this as an action in strict liability in tort and will follow this nomenclature without recognizing any difference between the action under that name and under either implied warranty or products liability. We hold that the correct law to be applied to this case is expressed in Restatement (Second) of Torts § 402–A (1965), as it is the best expression of the doctrine as it is generally applied, and for the additional reason that several federal courts have previously used that section in maritime cases. McKee v. Brunswick Corp., 354 F.2d 577, 584 (7th Cir.1965); Ohio Barge Line, Inc. v. Dravo Corp., 326 F.Supp. 863, 865 (W. D.Pa.1971); Soileau v. Nicklos Drilling Co., 302 F.Supp. 119, 127 (W.D.La. 1969). The doctrine as enunciated in the Restatement has been approved and applied by a number of state courts.

*See, e.g.,* O. S. Stapley Co. v. Miller, 103 Ariz. 556, 447 P.2d 248, 252 (1968); Garthwait v. Burgio, 153 Conn. 284, 216 A.2d 189, 192 (1965); Stewart v. Budget Rent-A-Car Corp., 57 Hawaii 71, 470 P.2d 240, 243 (1970); Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182, 187 (1965); Cornette v. Searjeant Metal Products, Inc., 258 N.E.2d 652, 656 (Ind.App.1970); Hawkeye-Security Ins. Co. v. Ford Motor Co., 174 N.W.2d 672, 684 (Iowa 1970); Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362, 364 (Mo.1969). We think the doctrine of strict liability in tort has been accepted and adopted by a sufficient number of states so that it is now and was at the date of Commander Lindsay's fatal flight a part of tort case law that should be embraced by federal maritime law. This also fulfills one of the primary goals of maritime law, uniformity.

The trial court found that the principles applicable to this case were those discussed by Chief Judge Matthes in Nicklaus v. Hughes Tool Co., 417 F.2d 983, 986 (8th Cir.1969) and quoted the following from that opinion:

"A manufacturer has a duty to exercise reasonable skill and care in the design and manufacture of its product, comensurate with the risk of harm flowing from normal use of that product. * * * This duty also binds the manufacturer with respect to component parts incorporated into its final product, but manufactured by another. * * * As a necessary corollary, a manufacturer has an affirmative duty to make such tests and inspections, during and after the process of manufacture, which are comensurate with the dangers involved in the intended use of the product.

"Where, as here, the plaintiff's claim against the manufacturer sound in both negligence and breach of implied warranty, he must establish by a preponderance of the evidence these basic elements: (1) that the product was defectively designed or manufactured, * * *; (2) that the defect was the proximate cause of the

damage complained of, * * *; and (3) that the defect existed at the time the manufacturer parted with possession of the product, * * *. To permit recovery for negligent manufacture, ordinarily plaintiff must show, in addition to lack of reasonable skill and care in the process of manufacture, that the manufacturer failed to make a reasonable inspection or test to discover defects." (Citations omitted.)

The *Nicklaus* case essentially, while not inconsistent with the theory of strict liability in tort in its three basic elements, was cast as a negligence case. Negligence requires a different standard and quantum of proof than does strict liability in tort. *Nicklaus* was tried on the basis of negligence in manufacture or failure to inspect, the court there finding that the alleged defect causing the helicopter to crash did not exist at the time the manufacturer parted with possession, noting that a favorable determination of the latter element is necessary to recovery under either negligence or breach of warranty (as it is also under strict liability).

Here, we do not think it was incumbent upon the plantiff to prove a specific defect in the aircraft. While it is not our province to weigh the evidence and the District Court made no contrary findings, the record shows that the aircraft was substantially in the same condition at the time of the crash as when it was delivered by McDonnell to the Navy, that it was being used for intended purposes, the manuevers being within the performance capabilities of the aircraft. The remaining factor for consideration was the cause of the crash. The District Court failed to make any finding as to whether or not the aircraft was on fire and crashed because of the fire. This appears to be the crucial point as a fire would strongly indicate a malfunction in the aircraft itself resulting from some defect in either manufacture, material, or design. We do not think it incumbent upon the plaintiff to show that the defendant installed a de-

fective part, knowing it to be faulty. This places an undue burden over and beyond the principles of strict liability in tort.

The plaintiff's most persuasive evidence is that of the shrimp boat captain relating that the plane was on fire. The new plane had less than four hours flight time including 42 minutes flight time on the fatal flight. If in fact it was on fire this would be a most unusual occurrence. The pilot was experienced and both the pilot and the navigator failed to eject, this giving some indication that the fire interfered with the ejection system. McDonnell presented expert testimony relating to pilot disorientation and the likelihood of vertigo occurring during a difficult maneuver of this type and also sought to counteract the testimony of the aircraft being in flames by suggesting it was venting fuel while descending in a stall with the afterburner on.

This admittedly poses a difficult evidentiary problem for each side. Circumstantial evidence is about the only evidence available. Courts would prefer even in a strict liability case to have proof of a specific defect causing the accident.[4] But this is not possible in many cases and particularly where the crashed vehicle is not available.

Here, of course, the plaintiff attempted to bolster her case by evidence that other aircraft manufactured by defendant had caught on fire and that defects were encountered with the bleed air duct system. This is to be considered with the other circumstantial evidence but it is not conclusive, either way. The defendant would be liable for death caused by a material failure in the operation of the aircraft that occurred if the aircraft were in substantially the same condition as when it left the manufacturer's plant and was being utilized and operated for the purposes intended and within the capabilities of the aircraft. The manufacturer would not be liable for pilot error or a failure of the pilot to properly maneuver the craft because of vertigo or some other disorientation causing him to fly the aircraft into the water. However, if the pilot was unable to properly fly the aircraft because of a malfunction in its parts or material and unable to eject because of a failure in the ejection system due either to the fire or other malfunction, principles of strict liability in tort would hold the manufacturer to account under Death on the High Seas Act.

The case of Franks v. National Dairy Products Corp., 414 F.2d 682 (5th Cir. 1969) (applying Texas law) has relevancy to the evidentiary issue under consideration. Plaintiff operated a drive-in restaurant and used Kraft Red Label Shortening manufactured by the defendant in his deep fat fryer. Plaintiff had used the product according to the directions and was draining it from the fryer to replace it with fresh shortening. He was draining it into an empty can from which it had been taken and which had been subsequently washed and allowed to drain dry for four days. The evidence was that there was no water or other foreign substance in the can. Nevertheless the shortening "exploded" and splashed plaintiff with the hot oil causing severe burns. Affirming a judgment for the plaintiff the Court of Ap-

4. *But, see,* Franks v. National Dairy Products Corp., 414 F.2d 682 (5th Cir. 1969) ; Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3d Cir. 1969) ; North American Aviation, Inc. v. Hughes, 247 F.2d 517 (9th Cir. 1957) ; McCann v. Atlas Supply Co., 325 F.Supp. 701, 703 (W.D.Pa.1971) ; Stewart v. Budget Rent-A-Car Corp., 57 Hawaii 71, 470 P.2d 240 (1970) ; Jacobson v. Broadway Motors, Inc., 430 S.W.2d 602 (Mo.App. 1968) ; Williams v. Ford Motor Co., 411 S.W.2d 443 (Mo.App.1967) ; Jakubowski v. Minnesota Mining & Mfg., 42 N.J. 177, 199 A.2d 826 (1964) ; Brownell v. White Motor Corp., 490 P.2d 184 (Or.1971) ; MacDougall v. Ford Motor Co., 214 Pa. Super. 384, 257 A.2d 676 (1969). In these cases the courts also allowed the proof of both a defect and the existence of a defect at the time the product left the defendant's possession to be made by circumstantial evidence.

peals held a defect can be inferred from unexplained occurrences, reasoning:

"The evidence indicates that shortening will not explode unless defective, or unless some foreign substance has adulterated the product. The district court found that appellee handled the product properly and that he negatived other causes of the incident, such as the presence of water or a similar liquid. Thus, although there was no proof of a specific, identifiable defect, the trial judge concluded that a defect in the shortening was the cause of the splattering because such a defect is the only thing that could have caused the explosion. In short, the existence of a defect was the only reasonable inference that was left. The burden of proof was not thereby shifted: Appellee still had the burden of proving that the explosion was caused by a defect in appellant's product. It was not necessary, however, for appellee to show the specific defect in order to meet that burden. As we have shown, the trial judge's inference of a defect from circumstantial evidence was not improper under the applicable law." 414 F.2d at 687.

See Stewart v. Budget Rent-A-Car, 470 P.2d at 243–244 for further discussion on the forms in which the proof of a defect might be allowed.

 The Supreme Court of Arizona has recognized the difficulty of providing direct evidence in strict liability cases. In a case involving proof that a particular clip had been installed by General Motors in an automobile, the court said:

"General Motors insisted throughout the trial and suggests on this appeal that the plaintiffs must meet this burden by some kind of direct evidence. We do not agree. The plaintiffs must be permitted to rely upon circumstantial evidence alone. There will seldom be a case based upon strict liability where a person will be able to testify from his personal knowledge that a particular product was sold in a certain defective condition. A requirement of direct evidence would effectively deny the theory of recovery [in strict liability]." Reader v. General Motors Corp., 107 Ariz. 149, 483 P.2d 1388, 1393 (1971).

There would be little gain to the consuming·public if the courts would establish a form of recovery with one hand and take it away with the other by establishing impossible standards of proof. The proof required in a strict liability case must be realistically tailored to the circumstances which caused the form of action to be created. As noted in Mac-Dougall v. Ford Motor Company, 214 Pa.Super. 384, 257 A.2d 676, 679 (1969):

"Proof of the specific defect in construction or design causing a mechanical malfunction is not an essential element in establishing breach of warranty. 'When machinery "malfunctions", it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the "sin" is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery.' Greco v. Bucciconi Engineering Co., *supra*, [D. C.] 283 F.Supp. [978] at 982."

An identical question to the one in the instant case was presented in North American Aviation, Inc. v. Hughes, 247 F.2d 517 (9th Cir. 1957), whether pilot error or a manufacturer's defect caused the fatal crash of a jet aircraft. The aircraft was destroyed and the pilot killed.. A verdict for the plaintiff was affirmed on circumstantial evidence that the aircraft caught fire in the air and the crash, therefore was probably due to a manufacturing defect.[5] No evidence

5. The court in North American Aviation v. Hughes in a case apparently tried only on the theory of negligence, sustained a verdict based on circumstantial evidence in the face of the same contention as in the instant case that the verdict could only be upheld by resort to the res ipsa loquitur doctrine and analyzed the evi-

was offered as to the specific cause of the fire although evidence was offered which pointed to certain possible causes, including evidence of a part in the aircraft which was discovered during assembly to have Foamite on it suggesting it had been on fire. This part was cleaned but not replaced or inspected and this suggested it as a possible source of the fire.

We hasten to add that the inferences from the circumstantial evidence in the cases we have cited are merely permissible, not compelled, and that the finder of fact may choose to draw them or refuse to draw them depending on the evaluation and weight accorded to competing and often conflicting circumstances.

Plaintiff however is entitled to have the case considered on the theory she has presented of strict liability in tort without the requirement that she show the specific defect which caused the crash and that the defendant had knowledge of it. If she can show that the crash was caused by some unspecified defect and that no other cause is likely, she has made a submissible case.

The plaintiff has requested us to disregard the findings of the trial court, find liability as a matter of law on the record and remand the case for consideration of the damage issue. We of course are not the triers of fact and it is still the function of the trial court to ascertain the facts and to make its findings. We do think it is central to this case to determine whether the aircraft was on fire at the time it crashed and if so, the probabilities of whether the fire was caused by a material failure or some malfunction. A determination of those issues would include consideration of expert opinion, including the experts who testified on behalf of the defendant that this was an out-of-control type of

accident and the accident was the result of the pilot inadvertently stalling the aircraft in trying to complete his re-attack under what the witness considered to be adverse conditions.

Reversed and remanded for proceedings consistent herewith.

dentiary problem as follows, 247 F.2d at 521:

"Although the true cause of the accident will probably remain a mystery, there appears substantial evidence to support the appellee's theory that the crash was due to a mechanical defect which developed *while the machine was still in the air*; in other words, a defect in the manufacture of the airplane, for which the appellant was responsible."