Martin DUNN, John Lynch, Robert Moll, Lyvia Y. Moll, Emanuel Lorras, and Irene McDermott, Individually and as Administratrix of the Estate of John J. McDermott, Deceased, Plaintiffs,

v.

SOUTHERN CHARTERS, INC., Norman Stern, Fairwind Yacht, Inc., William Farr, Marine Trading International, a division of Miller Yacht Sales, Inc., North Fork Shipyards, Inc., Defendants.

Nos. 78 C 298, 78 C 427, 78 C 819 and 79 C 1371.

United States District Court, E. D. New York.

May 27, 1982.

Brendan J. Stynes, Garden City, N. Y., for plaintiffs Martin Dunn and John Lynch.

Sidney Wolen, New York City, for plaintiff Irene McDermott.

Lazarowitz & Manganillo by Carlo Manganillo, Brooklyn, N. Y., for plaintiffs Robert Moll, Lyvia Y. Moll and Emanuel Lorras.

Hill, Betts & Nash by Robert S. Blanc and Lionell R. Saporta, New York City, for defendant Southern Charters, Inc.

Crowe, McCoy, Agoglia, Fogarty & Zweibel by Harold V. McCoy, Mineola, N. Y., for defendant North Fork Shipyards, Inc.

Vincent, Berg, Russo, Marcigliana & Zawack by Michael N. Cotignola, New York City, for defendant Miller Yacht Sales, Inc.

Philip J. Ofrias, Riverhead, N. Y., for defendant Fairwind Yacht, Inc.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

These consolidated actions for injuries and a wrongful death arise from the accidental burning of a chartered yacht, the "Second Wind," while anchored off the coast of Rhode Island. Jurisdiction is grounded upon 28 U.S.C. § 1333, and the issue of liability was tried by the court without a jury. The facts and legal discussion below constitute the court's findings and conclusions, Rule 52(a), F.R.Civ.P.

## EVIDENCE AT TRIAL

The Second Wind, a traditional design 37 foot ketch clipper, was built on behalf of Miller Yacht Sales, Inc. (Miller) in Taiwan. Miller sold the boat new to North Fork Shipyard, Inc. (North Fork), located in New Suffolk, Long Island, shipping separately an alcohol stove purchased from Seaward Products, Inc.[1] Subsequently, a carpenter employed by North Fork installed the stove in the main cabin of the Second Wind, mounting the range upon gimbals, a contrivance which suspends the stove and permits it to remain plumb despite rocking motions of the boat. A mechanic in North Fork's employ then connected the flexible hose supplied with the stove for conducting pressurized alcohol to the burners and tested the operation of the stove. Tr. at 1409.

North Fork fully commissioned the yacht and resold it in August 1976 to Southern Charters, Inc. (Southern), a Delaware corporation formed for the purpose of purchasing the vessel and chartering it to private individuals. The president of Southern, Norman Stern, arranged orally and by letter with Wornall Farr, the president of Fairwind Yacht, Inc. (Fairwind), for the latter to manage the chartering of the Second Wind in exchange for a commission of 35% of the chartering fee. Based in Greenport, Long Island, Fairwind agreed to maintain the boat and all equipment, assure the competency of each charterer, deliver the yacht to each charterer in clean ready-to-sail condition, arrange for advertising and charter payments, conduct inspections before and after each charter, and perform minor repairs. Southern remained responsible for major repairs, insurance, winter storage and fundamental maintenance costs. Tr. at 1076; Pl. Exh. 11.

Stern sailed the Second Wind once in November 1976 and several times in May 1977. Tr. at 1071, 1178. He encountered no problems in operating the stove or the forward hatch.[2] At the end of May 1977, Fairwind chartered the yacht for the first

1. In *Dunn v. Southern Charters, Inc.*, 506 F.Supp. 564 (E.D.N.Y.1981), the Court granted the motion of defendant Seaward Products, Inc. (Seaward) to dismiss the claims against it for lack of personal jurisdiction.

The stove purchased from Seaward and installed in the Second Wind was a HilleRange, model 3100, which was equipped with three burners and an oven. A flexible rubber or neoprene hose connected a tank of liquid alcohol to the stove burner manifold. Such stoves are designed so that once the tank is manually pressurized and the tank valve opened, liquid alcohol flows through the hose to the manifold located at the rear of the stove. Opening a burner valve then allows the alcohol to flow into a special priming cup situated at the base of each burner. Burning a small amount of alcohol in the priming cup raises the temperature of the burner body sufficiently to convert the liquid alcohol to vapor before it emerges from the burner conduit. At that point the burner is primed and will emit gaseous rather than liquid alcohol. Pl.Exh. 8, at 2–3.

2. The forward hatch provided access to and from the forward berthing compartment, which had a height of approximately seven feet. Constructed of oak and inserted with three square feet of plexiglass, the hatch was double hinged so that it could be opened either forward or aft. To select the direction of opening, hinge pins could be placed through either of the two sets of hinges located on the topside. If only one set of hinges was pinned, the hatch could be opened from the berthing compartment by releasing two metal latches and pushing upward. But if pins were placed through all four hinges, the hatch could not be opened from inside the boat.

time, receiving no complaints from the chartering party. Tr. at 1076. In accordance with prior arrangements, the Second Wind was then chartered through Fairwind by John McDermott, deceased, for the fateful voyage commencing June 9, 1977.

McDermott chartered the Second Wind for the purpose of taking a four day pleasure cruise to Cape Cod with four other men, Martin Dunn, John Lynch, Robert Moll and Emanuel Lorras. The latter four did not participate in the charter agreement, although the expenses were shared equally among the entire group. The charter instrument was not offered at trial, but it appears that no master or crew was supplied with the yacht; McDermott was given possession and control of the vessel for the four day rental period. Def. Exh. J; Tr. at 1079–80.

Of the five men, Moll and Lorras were not experienced sailors. McDermott, 40 years old at the time of death, had served in the Navy for four and a half years, had owned a 27 foot tartan as well as a small motor boat, had taught sailing for several years, and had remained generally active in sailing from the age of seventeen. Tr. at 54–56. Dunn, then a lieutenant in the New York City Police Department, had owned a 22 foot sailboat for three years which was equipped with an alcohol stove. Tr. at 581–82. As a police officer and in the Army he had on various occasions used fire extinguishers similar to the ones supplied on board the Second Wind. Tr. at 570.[3] Finally, Lynch had sailed on approximately 15 to 20 chartered yachts prior to the Second Wind. Tr. at 81.

**3.** Two Kidde dry chemical marine type BI fire extinguishers, approved by the Coast Guard, were installed in the Second Wind by North Fork. To operate these extinguishers, one must pull the pin, lift the handle and press the lever, directing the spray toward the base of the fire. Tr. at 1120–26.

**4.** The written instructions which were placed on the bulkhead above the stove provide, in legible part:
"1. Close tank valve.
2. Be certain that all appliance valves are closed.
3. To light burners: With fuel tank valve closed pump pressure tank to 10–20 lbs., making certain appliance valves are closed.

The McDermott party boarded the Second Wind late at night on June 8, 1977. Dunn inspected the safety equipment on board and requested from Farr a fifth life preserver, flares, and current navigational charts, all of which Farr provided. Tr. at 576–78. Farr instructed McDermott on the operation of the stove and pointed out the written instructions appearing on the bulkhead above the stove. Tr. at 693.[4] Prior to departure on the morning of June 9, Dunn attempted to open the forward hatch from inside the berthing compartment but was unable to do so. Tr. at 598. He did not pursue the endeavor, nor did he inform anyone on board of the apparently inoperative condition of the hatch. Tr. at 651–52. Also prior to departure, Dunn ignited one of the burners on the stove and made coffee without incident. Tr. at 581, 599.

After motoring out from the north shore of Long Island, the Second Wind encountered inclement weather in Block Island Sound. Tr. at 606. Because of the weather, the party headed for the Point Judith Harbor of Refuge on the coast of Rhode Island rather than toward Cape Cod. The weather worsened, and three to four foot waves began violently rocking the boat. Tr. at 92; Pl. Exh. 8, at 3. At approximately 8:00 P.M. on June 9, they arrived at the Harbor of Refuge and anchored the boat in relatively calm water. Lynch, Lorras and Moll participated in an anchor watch through the night while McDermott and Dunn slept. Tr. at 415, 611.

Open tank valve. Fill priming cup ½ full by opening one burner valve at a time. Do not leave burner while priming . . . . Light the priming fuel and wait . . . and light the burner. If burner will not burn like a gas burner, repeat priming.
4. Do not leave burner with low flame unattended.
5. Keep tank valve closed and depressurize system whenever appliance is not in use . . . .
7. Burning alcohol is readily extinguished by water.
IN AN EMERGENCY CLOSE TANK VALVE IMMEDIATELY."
Def. Exh. F.

At 6:00 A.M. on June 10, Dunn awoke and lit the stove in preparation for cooking breakfast. He turned on the valve for the right front burner, let a little alcohol run into the priming cup, shut the valve off and repeated the same procedure with the back burner. Tr. at 612. He then struck a match and lit the alcohol in both cups, after which he turned to the adjacent ice box to obtain the breakfast food items. He observed a small flame emanating from a fraction of an inch of alcohol in the splash pan below the burners but was not concerned because he had experienced such a flame previously. Tr. at 614, 641. After continuing his endeavors in the ice box for one to five minutes, Dunn saw a flame shoot out from behind the stove. Tr. at 614, 636–38. Suddenly, he heard a "woosh" sound as the flames shot swiftly over his head and along the ceiling to the other side of the boat. Tr. at 615. He shouted "Fire" and ran for a fire extinguisher. After pulling the pin, Dunn squeezed the handles together, but the extinguisher did not work and he threw it to the floor. Tr. at 573, 653–54. Dunn never testified that he had first lifted the handle before squeezing the lever as required by the instructions on the extinguisher. Within seconds of the initial combustion, the fire encircled the entire circumference of the boat where Dunn was standing. Tr. at 616. He did not see the ceiling actually burning, nor did he observe any smoke until he, Lorras and Moll had reached the cockpit via the aft companionway. Tr. at 620–21.

Meanwhile, McDermott and Lynch initially sought the second fire extinguisher, but encountered too great a conflagration and proceeded to the forward hatch to escape. Tr. at 107. McDermott pushed up on the hatch but was unable to open it, whereupon Lynch turned and saw the main cabin completely enveloped in black smoke and flame. *Id.* Touching McDermott, Lynch told him to run. Lynch then ran through the fire and climbed up the companionway into the cockpit, but McDermott did not follow. Lorras and Dunn tried unsuccessfully to open the forward hatch with a winch handle. After a few minutes they succeeded in breaking a small hole in the cover, but when black smoke poured out they concluded that McDermott had died below. Tr. at 500, 623. After a short time the four men abandoned the burning vessel and were rescued from the water by the Coast Guard.

Coast Guard personnel boarded the Second Wind to fight the fire and initially encountered difficulty in removing the hinge pins from the forward hatch. Pl. Exh. 8, at 5. Subsequent inspection of the interior of the boat revealed that the flexible hose which supplied alcohol from the tank to the stove had burned through. *Id.* at 6.

Plaintiffs produced four expert witnesses at trial. Daniel O'Connell is a civil and mechanical engineer, having spent three years in post-graduate work at the School of Engineering, Columbia University. He has had varied experience in the field of thermodynamics, including teaching, laboratory testing and investigation. Martin Perl is employed by Consolidated Edison, performing failure and accident analyses and establishing safety procedures. He has a doctorate degree in mechanical engineering and is a member of the American Boat & Yacht Council (ABYC). Walter Mac-Lean, acting director of the developmental laboratory of the National Maritime Research Center, has a doctorate degree in naval architecture and is a graduate of the United States Merchant Marine Academy. Carl Abraham is a professional safety engineer associated with a testing and consulting firm. He has a doctorate degree in chemistry. The substance of each expert's testimony follows.

*Daniel O'Connell*

As a result of the fitting used, a large quantity of alcohol vapor leaked from the manifold connection at the rear of the Hille-Range. Unknowingly, Dunn was standing knee-deep in alcohol vapor when he lit the stove. Such a quantity of vapor would not have been noticeable because it was odorless. Since alcohol vapor weighs more than air, it remained behind the stove and along the floor of the cabin until air convec-

tion currents caused by the heat from the priming flames lifted the vapor to the source of ignition.

The speed of the fire and the "woosh" sound described by Dunn indicate an extremely rapid combustion or explosion of alcohol vapor; the velocity of the flame equalled the speed of sound and created a swishing sound. Liquid alcohol burning in the splash pan could not have caused such a phenomenon because the liquid would have quickly burned away. Such a rapid combustion could only have been caused by an accumulation of vapor comprising at least seven per cent of the volume of the interior of the yacht. Further, a vapor explosion would have burned through the rubber tubing in a matter of seconds; whereas, a fire in the splash pan would not have burned through the hose.

The tank valve was found to be open upon subsequent inspection of the yacht, but closing the valve after ignition of the vapor would not have reduced the spread of the fire because the entire interior of the yacht burned simultaneously due to the explosive mixture of alcohol vapor throughout.

*Martin Perl*

The AYBC publishes a booklet entitled "Safety Standards for Small Craft" containing standards which are voluntarily accepted by virtually every manufacturer who supplies equipment for marine use. The standards were adopted in 1965 and are applicable to a 37 foot boat such as the Second Wind. While the Coast Guard referred to AYBC standards in its report on the Second Wind fire, Pl. Exh. 8, it has not adopted official regulations directed specifically toward domestic sailing vessels. Section 2.1 of the AYBC standards recommends that galley stoves shall be certified for marine use, which means tested and approved by Underwriters Laboratory. But the HilleRange, model 3100, would not be certifiable because the rubber hose connects to the burner manifold too closely to the heat generated from the stove. Further, the hose connection itself could not pass leak pressure tests because of the ab-

sence of metal clamps at the end of the hose. The use of such clamps would have solved the leakage problem, but rubber decomposes at temperatures exceeding 300 degrees Fahrenheit; so that even the use of metal clamps would not make the stove certifiable.

Similarly, the National Fire Protection Association (NFPA) publishes safety standards for cooking equipment on motor craft. NFPA publication No. 302, § 6–1.1 recommends that galley stoves shall be approved for marine use. Further, § 6–1.6 provides that woodwork and combustibles immediately surrounding stoves should be insulated with noncombustible materials; yet the areas above and surrounding the stove on the Second Wind were panelled with flammable materials, specifically, marine plywood laminated with formica.

When the burners on the HilleRange were lit, heat was conducted to the rubber tubing through the manifold connection. Under normal operating conditions, the temperature would range from 300 to 400 degrees Fahrenheit. While such heat would cause rubber to oxidize and become brittle, it would have no deleterious effect on metal connectors. Assuming the flame in the splash pan was 300 degrees Fahrenheit, the rubber tubing above the pan would take an hour to burn; whereas, the intense heat resulting from an alcohol vapor fire would burn through the rubber in 20 to 30 seconds.

*Walter MacLean*

Fire safety is a critical element in ship design, specifically in selection of construction materials, arrangement of space, development of systems to combat fire and provisions for emergency egress. Fuel conduits, including the conductor as well as the fittings, must be constructed of materials which will neither deteriorate from carrying the fuel nor degenerate from any fire caused by combustion of the fuel. Rubber is an undesirable material for conducting fuel because it ages, contracts and softens and deteriorates under heat. Further, it will support combustion if ignited. Neoprene has the same disadvantageous qualities.

The absence of a clamp at the connection of the rubber hose to the burner manifold enhanced the possibility of leakage. Of the hundreds of boats he has personally observed, MacLean has never seen a rubber hose used to connect a supply of liquid alcohol to a stove. Such a fuel line is unsafe.

*Carl Abraham*

The connection on the stove is not acceptable from a safety perspective. Liquid alcohol in the splash pan may catch fire, exposing the hose to intense heat. Rubber decomposes in the range of 400 to 500 degrees Fahrenheit. If the hose burned through, however, the 10 to 20 pounds of pressure in the tank would be released almost immediately; therefore, liquid would escape from the tank for only a second or two. It was not dangerous to light two burners at once.

Metal tubing could not have been used completely; however, the system should have been designed so that the rubber or neoprene remained a safe distance from the heat of the stove. The vapor explosion could have been avoided by the use of clamps at both ends of the hose. If someone had left the tank valve open overnight, enough vapor could have seeped through the hose connections to cause the spontaneous combustion described by Dunn.

Defendants produced one expert at trial. Employed by his own marine surveying firm, Robert Reutti assesses damage to yachts. After graduating from the United States Merchant Marine Academy, he gained experience both at sea and as a marine surveyor. Reutti is a charter member of the National Association of Marine Surveyors and served two terms on the board of directors of the ABYC.

The substance of Reutti's testimony follows. The hose connecting the stove to the alcohol tank was constructed of neoprene. The neoprene hose is very susceptible to burning and will burn through in about 10 to 15 seconds when subjected to burning liquid alcohol. When the fire in the splash pan burned through the hose, it began spreading about three feet of flames around

the cabin due to the pressure in the system. Dunn improperly operated the stove first by priming two burners at the same time, and second by ignoring the fire which spread beyond the intended confines of the priming flame. Although the use of neoprene for connecting fuel supplies is common, the material is flammable and presents a potential hazard when connected directly to the stove. The flammable materials inside the main cabin contributed to the spread of the fire, but flame-retardant materials surrounding the stove would not have hindered the spread of the fire because the pressure from the tank caused the burning alcohol to spray beyond the immediate area of the HilleRange. A vapor explosion could not have occurred because alcohol vapor is lighter than air and therefore rises. The HilleRange, model 3100, was not in compliance with the NFPA recommendations, but the industry does not customarily comply with the various safety recommendations promulgated by such organizations, including the ABYC. The majority of marine cooking stoves are placed in alcoves surrounded with flammable material.

## DISCUSSION

Three theories of recovery are propounded in this action. All plaintiffs join in asserting the doctrine of unseaworthiness, claiming that defendants' breach of implied warranty caused the loss of life and injuries sustained in consequence of the burning of the Second Wind. In addition, plaintiff Irene McDermott, individually and as administratrix of the estate of her deceased husband, asserts two theories of recovery, *viz.*, negligence and strict liability in tort, for the death and loss of consortium allegedly caused by defendants' maritime tort.

*Unseaworthiness*

■■■ The McDermott charter comprised a "demise" or "bareboat" charter because Southern "completely and exclusively relinquish[ed] 'possession, command, and navigation'" of the Second Wind to McDermott, the demisee for the four day charter period. *Guzman v. Pichirilo,* 369 U.S. 698, 699, 82

S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962), quoting *United States v. Shea*, 152 U.S. 178, 186, 14 S.Ct. 519, 521, 38 L.Ed. 403 (1894). Southern therefore impliedly warranted the vessel's seaworthiness upon delivery to the demisee. *Cullen Fuel Co. v. W. E. Hedger, Inc.*, 290 U.S. 82, 88, 54 S.Ct. 10, 11, 78 L.Ed. 189 (1933). However, during the term of the charter, McDermott was vested with *pro hac vice* ownership obligations and responsibilities. *Reed v. The Yaka*, 373 U.S. 410, 412, 83 S.Ct. 1349, 1351, 10 L.Ed.2d 448 (1963). The question becomes, then, whether plaintiffs have proved by a preponderance of evidence a preexisting condition of unseaworthiness.

■ Seaworthiness is defined as "the sufficiency of the vessel in materials, construction, equipment, . . . and outfit for the trade or service for which it is employed." *The Southwark*, 191 U.S. 1, 8, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903), quoting Bouvier's Law Dictionary. Even in the absence of negligence, a shipowner is liable for unseaworthiness when it supplies defective equipment not reasonably fit for the purpose for which it was intended. *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 317, n.3, 84 S.Ct. 748, 750, n.3, 11 L.Ed.2d 732 (1964). Nevertheless, as the Supreme Court has stated, the implied warranty does not impose a standard of perfection:

> "What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]."

*Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). See also, *Morton v. Berman Enterprises, Inc.*, 669 F.2d 89 (2d Cir. 1982). Stated differently, the doctrine of unsea-

worthiness does not extend "to allow recovery for injuries caused by the contemporaneous negligent usage of seaworthy appliances." *Massa v. C. A. Venezuelan Navigacion*, 209 F.Supp. 404, 408 (E.D.N.Y.1962), *aff'd in pertinent part, rev'd in part*, 332 F.2d 779 (2d Cir.), *cert. denied*, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186 (1964).

Plaintiffs attack as unseaworthy four specific aspects of the Second Wind: (1) the rubber or neoprene hose utilized to conduct alcohol fuel to the HilleRange; (2) the absence of flame-retardant materials in the immediate area around the stove; (3) the fire extinguisher which Dunn attempted to use; and (4) the forward hatch.

■ Regarding the alcohol fuel conduit, the evidence is in a state of utter contradiction. Hardly a point was made by plaintiffs' experts that was not directly rebutted by equally qualified testimony on behalf of defendants. Yet two items of note remain conspicuous. First, to establish that the hose was not fit for its intended use, plaintiffs relied solely on opinion testimony unsupported by scientific testing, stress analysis or laboratory investigation. No evidence was presented pertaining to prior malfunctioning of the hose on this or any other HilleRange stove; rather, the evidence shows that the stove was used many times without mishap. Indeed, not even the substance of the hose was analytically determined. Although the Court is aware of the importance of expert testimony in cases involving complex appliances, it is incumbent on the proponent to present factual evidence which substantiates proffered opinion. The duty of determining credibility of opinion testimony devolves upon the trier of fact, *United States v. Alker*, 260 F.2d 135, 156 (3d Cir. 1958), *cert. denied*, 359 U.S. 906, 79 S.Ct. 579, 3 L.Ed.2d 571 (1959), and the Court will not blindly accept the legitimacy of the unsubstantiated opinions and theories of plaintiffs' experts.

■ The second point which stands out is that the rapid diffusibility of vapor, a fact of which the Court takes judicial notice, undermines the validity of plaintiffs' theory of causation. Plaintiffs' entire case rested

on the theoretical leakage of huge quantities of alcohol vapor from the manifold connection at the rear of the stove. Critical to this theory is the presence of vapor, filling at least seven percent of the volume of the interior of the yacht, which remained below the height of the priming flames until the heat from those flames carried the gas to the source of ignition. However, as pointed out in A. Laughlin, Roe's Principles of Chemistry 59 (12th ed. 1976), a fundamental quality of molecules in a gaseous state is rapid, uniform and indefinite diffusion through space. Because of their elasticity and ability to expand, particles of gas completely fill any container into which they are released. *Id.* Therefore, the Court rejects the credibility of plaintiffs' theory that Dunn was standing knee-deep in alcohol vapor when he lit the stove, and that the cause of the accident was the spontaneous combustion of such vapor once it reached the level of the priming flames.

■ Further, assuming arguendo the existence of a defect, plaintiffs have failed to prove a causal relationship between such defect and the injuries of which they complain. This is not a case in which a mysterious explosion occurs without apparent cause. Human conduct intervened. Unfortunately, the facts adduced at trial conclusively show neither innocence nor negligence on the part of Dunn. Yet by the same token, the record is devoid of facts which show that a defect in the stove, rather than human error, caused the fire. The circumstances established by Dunn's testimony are such that it is equally reasonable to infer that the fire started from the flame in the splash pan, which Dunn noticed but failed to extinguish, as from a vapor explosion.

■ Viewing the totality of evidence, direct and circumstantial, opinion and fact, in light of the inherent implausibility of plaintiffs' vapor explosion theory and the absence of scientific testing or calculations, plaintiffs failed to prove by a preponderance of evidence either a defect in the fuel conduit or causation in fact.

■ Plaintiffs' claim regarding the flammable construction materials in the immediate vicinity of the stove must similarly fail. All experts at trial agreed that under either theory of causation the fire immediately spread beyond the vicinity of the stove. Whether vapor spontaneously exploded throughout the interior of the yacht or the flexible hose burned through and sprayed liquid alcohol around the main cabin, flame-retardant material surrounding the stove could not have impeded the fire. Hence, such condition cannot be considered a cause in fact of the subsequent injuries.

■ Moreover, plaintiffs again failed to prove that the bulkhead and the construction of the main cabin were not reasonably fit for use in conjunction with a cooking stove. No evidence was offered from which it can be inferred that normal usage of the stove would have resulted in an uncontrollable conflagration such as the one which occurred.

■ The law does not impose upon the shipowner the duty to maintain a vessel impervious to negligent use of incendiary appliances, but rather requires only that the ship's construction be reasonably fit. *Mitchell v. Trawler Racer, Inc., supra.* Although plaintiffs attempted to show that the construction of the Second Wind did not comply with safety recommendations of the ABYC and NFPA, such recommendations do not constitute legal standards of seaworthiness, since the organizations are non-governmental entities. Plaintiffs' expert Perl testified that the boating industry universally adheres to such recommendations, but the Court is not satisfied that either through training or experience Perl is qualified to judge the boating industry's practice in this regard. Further, defendants' expert Reutti, who formerly served on the ABYC board of directors, testified that the industry routinely rejects ABYC recommendations. Hence, plaintiffs failed to prove either directly or by inference that the construction of the Second Wind was not reasonably fit.

With regard to the fire extinguisher, only a few words need be said. Dunn's own testimony left the Court, as trier of fact, wholly unconvinced that any defect existed. The extinguishers had been recently installed and inspected, and the evidence leaves the Court with grave doubts as to the malfunction of the equipment as opposed to its improper usage.

Plaintiffs' final claim of unseaworthiness concerns the forward hatch. There is no question that emergency egress is a fundamental concept in ship safety. Just as insufficient fire fighting equipment may render a ship unseaworthy, see, *e.g.*, *Asbestos Corp. v. Compagnie de Navigation Fraissinet et Cyprien Fabre*, 480 F.2d 669 (2d Cir. 1973), so too it would seem that inadequate egress from areas in which fires may be reasonably anticipated may subject a shipowner to liability. Nevertheless, once again the issue becomes one of proof. No evidence was presented which indicates the hatch was inherently inoperative. Stern's and Farr's testimony that the hatch worked properly on previous occasions remains uncontested. Plaintiffs instead sought to show that on the instant occasion Southern delivered the vessel with pins through all four hinges of the hatch, thereby rendering it inoperable from the interior of the yacht. But the evidence fails to show that such a condition preexisted delivery of the Second Wind to McDermott, and this failure of proof suffices of itself to exonerate Southern from liability on this claim. *Cannella v. Lykes Bros. S.S. Co.*, 174 F.2d 794 (2d Cir.), *cert. denied*, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949).

Moreover, assuming that all four pins were in place at the inception of the charter, plaintiffs do not contend that two of the pins could not have been removed at any time during the voyage, even while McDermott attempted to escape from the fire below. Finally, in view of Lynch's testimony that when faced with the inoperation of the hatch he touched McDermott, told him to run and escaped successfully up the companionway, the Court cannot find that the condition of the hatch prevented emergency egress from the interior of the yacht. The fact remains that the four survivors did achieve egress though faced with the same emergency; therefore, proof of causation is lacking.

### Strict Liability and Negligence

Federal admiralty and maritime jurisdiction encompasses the doctrines of negligence and strict tort liability, *Sieracki v. Seas Shipping Co.*, 149 F.2d 98 (3rd Cir. 1945), *aff'd*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir. 1972), and plaintiff McDermott asserts both causes of action against all defendants. Strict tort liability and the unseaworthiness doctrine appear parallel, in that both impose liability for harm caused by a defective condition without regard to fault. The main distinction appears to be that the shipowner warrants the seaworthiness of a chartered vessel, *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 at 100, 66 S.Ct. 872 at 880, 90 L.Ed. 1099; whereas, only manufacturers and distributors may be held strictly liable in tort, see *Boncich v. M. P. Howlett, Inc.*, 421 F.Supp. 1300 (E.D.N.Y.1976); Restatement (Second) of Torts § 402A, Comment f (1965).

Thus, the question becomes whether Miller or North Fork sold the Second Wind to Southern in defective, *i.e.*, unreasonably dangerous, condition and whether such condition caused the death of McDermott. The Court concludes for the reasons discussed above that plaintiff has failed to prove by a preponderance of evidence either that the yacht, including its appliances and appurtenances, was sold to Southern in unreasonably dangerous condition or that McDermott's death was caused thereby.

Turning finally to plaintiff McDermott's negligence theory, the traditional elements of a negligence cause of action must have been proved at trial: duty, breach and causation. The principles of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), have been integrated within maritime tort jurisprudence, *Sieracki v.*

Seas Shipping Co., supra, and such principles are no longer limited in their application to manufacturers, but extend to owners and lessors as well. *La Rocca v. Farrington*, 301 N.Y. 247, 93 N.E.2d 829 (1950); Restatement (Second) of Torts §§ 388, 408. Put simply, the instant defendants owed a duty to exercise reasonable care in manufacturing, distributing and maintaining the vessel in reasonably safe condition.

Plaintiff's burden, then, was to prove that the defendants failed to exercise such care and that their breach of duty was a cause in fact of McDermott's death. Yet no facts were established at trial from which negligence can be inferred. Rather, the evidence shows that the installer of the stove, North Fork, inspected and tested its operation upon installation. Subsequently, Southern and Fairwind, through their respective presidents, Stern and Farr, tested and inspected every aspect of the operation of the yacht, including the stove and the forward hatch. Farr even tested McDermott's sailing ability as a prerequisite to entering into the charter agreement. Prior to departure, Farr provided the crew with adequate safety equipment and instructed McDermott on the proper usage of the stove, also pointing out the written instructions posted on the bulkhead above the stove. Far from showing a lack of diligence, the evidence adduced at trial shows that defendants took every reasonable precaution to assure the safety of the vessel and its passengers.

Moreover, the Court, as trier of fact, remains equally in the dark regarding the causal relation between defendants' alleged negligence and McDermott's death as in the context of the unseaworthiness and strict liability claims. Plaintiff has not come forward with a preponderance of evidence showing that any conduct of defendant was a substantial causative factor in the events which led to the death of her husband. See Restatement (Second) of Torts §§ 430–33; W. Prosser, Law of Torts § 41, at 240 (4th ed. 1971). Inadequate causal relation having been shown, defendants cannot be held liable for the death, however tragic.

Accordingly, the amended complaint in admiralty is dismissed.

The Clerk of the Court is directed to enter judgment for defendants, dismissing the complaint, and to forward copies of this Memorandum of Decision and Order to counsel for all parties.