**GENERAL INTERMODAL LOGISTICS CORPORATION, Plaintiff,**

v.

**MAINSTREAM SHIPYARDS & SUPPLY, INC., Defendant,**

v.

**TRAVELERS INSURANCE COMPANIES, Third–Party Defendant.**

**No. GC 76–165–S.**

United States District Court,
N. D. Mississippi,
Greenville Division.

July 1, 1980.

Frank S. Thackston, Jr., Lake, Tindall, Hunger & Thackston, Greenville, Miss., Hubert I. Binowitz, St. Louis, Mo., for plaintiff.

W. Scott Welch, III, Butler, Snow, O'Mara, Stevens, & Cannada, Jackson, Miss., for defendant.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action came on for trial before the court, sitting without a jury, at the United States Courthouse in Greenville, Mississippi, in the Northern District of Mississippi, on January 21, 1980. The plaintiff, General Intermodal Logistics Corporation (hereafter "Gilco"), through its counsel, announced ready for trial. The defendant, Mainstream Shipyards & Supply, Inc. (hereafter "Mainstream"), through its counsel and duly–appointed trial representative, announced ready for trial. The third–party defendant, Travelers Insurance Companies, did not appear, the third–party complaint having been previously dismissed as to said third–party defendant.

Whereupon the court heard the evidence produced by the parties; and, at the conclusion of the trial, on January 23, 1980, took the action under advisement for the release at a subsequent date of its findings of fact, conclusions of law, and the entry of final judgment, all as required by Rule 52(a), Fed.R.Civ.P.

In response to a request by the court, the parties have submitted post–trial memoranda and the action is now ripe for decision.

After a careful and detailed study and review of the pleadings, evidence, pretrial and post–trial memoranda, Gilco's proposed findings of fact and conclusions of law, and Mainstream's proposed finding of fact and conclusions of law, as amended, the court has concluded that Gilco is entitled to recover damages of Mainstream, as a result of Mainstream's negligence and carelessness in its failure to install oil filter elements and remove the slag from the lubrication system of the engines of the M/V Jane T, and to properly align the intermediate and tail shafts and set the foundations of both engines.

In support of this finding of liability, the court adopts the findings of fact and conclusions of law, as follows.

A. *FINDINGS OF FACT.*

1. Gilco is and was a corporation organized and existing under the law and engaged in the maritime transportation business at all times mentioned in evidence.

2. Mainstream is and was a corporation, organized and existing under the law, and at all times pertinent, operated a shipyard for the repair of commercial towboats.

3. In 1973, a corporation was formed and named General Marine Towing Company, with its offices in the City of Greenville, Mississippi, for the purpose of operating a marine transportation business. Gilco owned fifty (50%) percent of the shares of stock of General Marine Towing Company, Inc. (GMT) and James Nowell and Emory Skelton, Greenville residents, each owned twenty–five (25%) percent of the stock.

4. Gilco, prior to the formation of GMT, owned the M/V Jane T, a commercial towboat measuring 125′ in length and 30′ in width. Upon the formation of GMT, Gilco transferred the title of said vessel to GMT where it remained throughout the period of time during which the events mentioned in evidence occurred.

5. On or about June 13, 1974, Mainstream, following dealings with Gilco, entered into a written contract to repower and refurnish the M/V Jane T in accord-

ance with certain specifications mentioned in the contract. Due to arrangements between Gilco and GMT and the division of activities between the affiliated corporations, a written contract was entered into by and between Mainstream and GMT. The signature on behalf of GMT was by one Charles R. Glenn, Vice President of Gilco, for General Marine Transport.

6. Among the work to be performed by Mainstream pursuant to said contract, was the installation of two (2) 12–567 C engines, converted to 645 E–2 units, modification of the bases to suit the new engines and reduction gears, to furnish and install two main engine lube oil priming pumps, two new intermediate shafts with bearings and fit the old couplings with the new fitted bolts, as well as furnishing and installing reduction gear oil coolers, filters and relief valves.

7. Following completion of the installation of the required units and purported compliance with the contract, Emory Skelton, at the time Vice President of GMT, was invited for a sea trial on the Mississippi River on the M/V Jane T. Several hours running in deep water revealed to Mr. Skelton a degree of vibration about which he complained, and certain minor modifications were made by Mainstream as a result. Following a sea trial in December, 1974, Mr. Skelton who lacked training in the operation of vessels executed at the request of Mainstream, a document entitled "Acceptance and Release" purporting to effectuate a release of any and all rights, claims, liens, remedies or causes of action for all damages arising from failure, if any, of Mainstream to comply with the terms of said contract.

Thereafter, due to lack of business for the M/V Jane T, which was thereafter renamed the Jane Elizabeth, the vessel was moored in Lake Ferguson until mid–May 1975, when it was moved to Memphis, Tennessee, for more economical fleeting. Approximately June 11, 1975, the M/V Jane Elizabeth, upon engaging towing contracts, proceeded upstream on the Mississippi River from Memphis, to the Ohio River, finally arriving at Cattletsburg, Kentucky. During the run to Cattletsburg, the operation of the boat was marked with problems, including excessive vibration and instances of the governor prematurely shutting off the engine. On June 18, 1975, as the result of these difficulties, Gilco summoned National Marine Service, the company which provided and installed the engines at Mainstream's Shipyard, for assistance. Service men attended the vessel and it was discovered that oil filter elements were not installed in the canisters. Further inspection revealed that welding slag had been allowed to remain in the engines' systems which should have been blocked and absorbed by the oil filter element. Services were performed by National Marine Service personnel, and the slag was examined and found to be the type resulting from welding, presumably in constructing the piping for the lubrication unit. The system was drained and fresh oil and filters were installed.

8. Following the service of June 18, 1975, the vessel proceeded up the Ohio River and intermittently experienced engine problems and excessive vibration and in accordance with arrangements the M/V Jane Elizabeth was drydocked at the Portsmouth, Ohio, area on or about August 28th, at which time the alignment of the intermediate and tail shafts was checked by B & Q Machine and Repair, Inc. of Point Pleasant, West Virginia, and it was determined that the alignment and also the face and counterbore between the tail and intermediate shafts were not true on both port and starboard. Necessary work was performed by that company to effect realignment. As a result of the original errors in the alignment by Mainstream, the port gear box was found to be high and the foundation of that engine was lowered. Furthermore, the starboard foundation required the same type of correction.

9. During the period of lay–up in drydock, the engines were checked by the vessel's engineers, and found to contain serious damage as a result of the slag entering the system. National Marine Service dispatched its service engineer to the site and

it was noted that all bearings of the engines were scarred with imbedded slag or foreign material and required replacement. Various other elements of the engines also needed replacement or repair.

10. The court finds that in the course of the construction of the lube oil system by Mainstream, certain elements were joined by welding, which welding created slag and such slag, or portions thereof, if allowed to remain within said lube oil system, was capable of causing the damage to the engines of the M/V Jane Elizabeth which was discovered by its crewmembers and the National Marine service personnel. The absence of oil filter elements contributed to cause the damage to the engine units. Although Y–dump strainers had been installed by Mainstream, such devices do not block particles of slag which would have been collected by the oil filter elements.

11. The aforesaid repair services rendered by National Marine and B & Q Machine & Repair, Inc., were the result of Mainstream's failure to install oil filter elements in the lube oil systems of the two engines, to remove any welding slag left from its operation and to properly align the intermediate and tail shafts. The evidence reflects Mainstream was obligated to furnish the oil filter elements. The court finds as a fact same were not provided upon delivery of the vessel. Prior to the discovery of the absence of the elements no reason existed for their removal or inspection by crew members in view of its protracted period of inactivity. The M/V Jane Elizabeth was under surveillance by General Marine Towing during its lay--up period. Only minimal navigation occurred following its return to service in May or June, 1975. Further, the court finds as facts, that the intermediate and tail shafts and the engines aboard the M/V Jane Elizabeth were misaligned so as to cause excessive vibration during normal operations. Such misalignment, as well as the failure to install oil filter elements and remove welding slag, constitute a failure to exercise ordinary care by Mainstream.

12. The reasonable cost of repairs necessitated by the aforesaid negligence can be allocated as follows, to:

| | |
|---|---|
| National Marine Service | $52,883.06 [1] |
| B & W Machine & Repair, Inc. | 14,972.00 |
| Portsmouth Docking Co., for the drydocking of the vessel during the aforesaid repairs in Sept. and Oct. 1975 | 6,200.00 [2] |
| Expenditure of wages for crew members during drydocking of vessel | 4,515.00 |

In addition, the service of Marine Loss Control, Inc., a marine surveying company of

---

1. Plaintiff paid National Marine service for repairs to the M/V Jane Elizabeth, the sum of $53,064.76. This expenditure contains charges for items which the court finds are not proper and must be deducted. These items are:

| | |
|---|---|
| 1. Maintenance manual | $ 19.50 |
| 2. Tachometer | 162.20 |

(Items 1 and 2 are reflected on page 4 of Plaintiff's Exhibit 8(a))

| | |
|---|---|
| Total | $181.70 |

2. The evidence reflects that plaintiff's demand for docketing charges in the sum of $7,771.75, should be reduced by the following items:

1. Supplies purchased by port engineer in the amount of $207.75, which are not related to necessary repairs to the vessel and which plaintiff concedes, in its memoranda, to be an improper charge;

2. Special blocking charges in the amount of $990.00, because the M/V Jane Elizabeth blocking plans were not aboard; and

3. The Portsmouth Docking Company submitted two invoices for services rendered and supplies furnished the M/V Jane Elizabeth in the repair of the vessel. The first, dated on September 30, 1975 (Defendant's Exhibit No. 30), amounts to $7,397.75. The second, dated the same as the first, i. e., September 30, 1975, is in the sum of $7,771.75, for which plaintiff demands reimbursement. The difference is $374.00. The items appearing on the $7,771.75 invoice for $7,397.75, are related to repairs to the starboard steering rudder. The original invoice reflects 371 hours of non overtime labor; the original, only 337. The court finds that the additional 34 hours of work relate to the repair of the starboard steering rudder, an item not chargeable to defendant.

Defendant is entitled to a reduction for these three items, aggregating $1,571.75.

St. Louis, Missouri, was reasonably engaged by plaintiff to supervise and evaluate the necessity and scope of repairs, for which services said firm charged the reasonable sum of $874.32.

13. On September 2 and September 3, 1975, Gilco informed Mainstream by telegram of the events occurring during the past six weeks, and upon the revelation of the extent of damage caused by the absence of oil filters and the required realignment of the tail shafts and engines, no response was made by Mainstream to these communications and no representative attended the vessel while in drydock.

14. In approximately September, 1975, Gilco surrendered its stock for valid consideration to GMT and as a consequence of the separation, Gilco received the proprietary interest in the M/V Jane Elizabeth, thereby acquiring all rights, as well as liabilities pertaining to said vessel, including the right to assert any claims against Mainstream. Gilco had originally financed the purchase of the towboat involved and at the time of the events mentioned in the evidence, was making payments toward the purchase price. After the split between Gilco and GMT, Gilco placed title to the vessel in Apollo Towing Company, a wholly owned subsidiary of Gilco and in 1976, a merger occurred between Gilco and Apollo Towing Company resulting in the formal titling of the towboat in the name of Gilco.

### B. CONCLUSIONS OF LAW.

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. The negligence and carelessness of Mainstream in its failure to install oil filter elements, remove the slag from the lubrication system of the engines of the M/V Jane T and to properly align her intermediate and tail shafts and to set the foundations of both engines directly and proximately caused plaintiff to suffer damages in the amount of $79,444.38 for which Mainstream is liable, in addition to pre–trial interest at the rate of 8% per annum from the date suit was instituted.

3. The contract entered into by and between GMT and Mainstream on or about June 13, 1974, contained a disclaimer of any warranty of merchantability or any other warranty express or implied. Such disclaimer, however, failed to negate any claims for negligence arising out of the performance under the contract and, therefore, such disclaimer may not serve as a bar to Gilco's action. *Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *cert. den.*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

4. Count II of Gilco's amended complaint is based on recovery for a tort and not a breach of contract. *Anglo Eastern Bulkships, Ltd. v. Ameron, Inc.*, 460 F.Supp. 1212 (S.D.N.Y., 1978).

5. Gilco, by reason of the terms of its separation from GMT in 1975, acquired the title to all claims arising out of the contract between Mainstream and GMT under date of June 13, 1974.

### CONCLUSION

In conclusion, the court finds that the plaintiff is entitled to recover from defendant the sum of $79,444.38, with interest at 8% per annum from December 20, 1976, until paid. The clerk is directed to enter a Final Judgment in accordance with this finding.