**GENERAL INTERMODAL LOGISTICS CORPORATION, Plaintiff-Appellee,**

v.

**MAINSTREAM SHIPYARDS & SUPPLY, INC., Defendant-Appellant.**

No. 80–3572.

United States Court of Appeals, Fifth Circuit.

Jan. 20, 1982.

---

Rhesa H. Barksdale, W. Scott Welch, III, Jackson, Miss., for defendant-appellant.

Lake, Tindall, Hunger & Thackston, Greenville, Miss., Goldstein & Price, Hubert I. Binowitz, St. Louis, Mo., for plaintiff-appellee.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

COLEMAN, Circuit Judge.

Mainstream appeals the judgment in favor of General Intermodal Logistics (Gilco) in the sum of $79,444.38 with interest at the rate of eight percent per annum from December 20, 1976 until paid. The District Court, 502 F.Supp. 38, sitting in admiralty, found that Mainstream was negligent in its failure to install oil filter elements, in its failure to remove slag from the lubrication system of the newly installed engines of the M/V JANE T, and in its failure to align properly the intermediate and tail shafts, plus a failure to set the foundations of both engines, all charged to negligence.

## I

### The Findings Against Mainstream

Mainstream, which operated a shipyard for the repair of commercial towboats, on June 13, 1974, made a contract to repower the JANE T, with the owner furnishing the two engines.

Pursuant to that contract Mainstream installed two 12–567 C engines, converted to 645 E–2 units, modified the bases to suit the new engines and reduction gears, furnished and installed two main engine lube oil priming pumps, two new intermediate shafts with bearings, fitted the old couplings with the new fitted bolts, as well as furnished and installed reduction gear, oil coolers, filters, and relief valves. National Marine Service provided the engines. Since certain parts of the engines were welded, National Marine Service was to remove welding slag from the engines. However, Mainstream's fabrication of piping for the lube oil system also required welding which would cause slag.

A new filter case was to be installed by Mainstream as part of the external lube system for each engine. In addition, Mainstream undertook the alignment of each engine with its propeller shafts.

After the completion of Mainstream's work in early December, 1974, dock and river trials were held. During the dock trial, the engines were run for four hours. No problem, such as heat in the bearings which could be a sign of misalignment, was noted. Also, during a trial on the Mississippi, there appeared to be no problems of any consequence. The vibration felt during the trial was thought to be normal. After the trials, Joe Williams, then Executive Vice-President of Mainstream, gave no instructions to remove the lube oil filters and has no knowledge of any repair work that would have necessitated their removal. Mainstream did inspect and clean the Y-dump strainers, filters through which the

lube oil passes before going back to the engine.

Shortly after acceptance, Skelton and others ran the JANE T for 10—11 hours to and from Mayersville on the Mississippi River, pushing a barge on the return trip. Two Mainstream employees assisted, including checking the lube system and alignment. After the Mayersville run, there was no complaint to Mainstream concerning either the lube oil system or the engines. Due to lack of business for the JANE T, soon renamed the JANE ELIZABETH, the vessel was moored for six months in Lake Ferguson at Greenville, Mississippi. A watchman was on the vessel from mid-March until mid-May, 1975. Except for a brief period in May, logs were not kept until June 10, 1975. In mid-May, the vessel was moved from Greenville to Memphis, Tennessee.

M. L. Brison, chief engineer of the JANE ELIZABETH, testified that he sensed extreme vibration during the vessel's first voyage in June, 1975. The inside of one of the searchlights vibrated loose and shorted out. On June 18, 1975, as the result of these difficulties, Gilco called National Marine Service for assistance. It was discovered that the canisters in both the starboard and port engines lacked oil filter elements. In addition, excessive welding slag, lock washers, bolts, and burnt welding rods were found in the base of the starboard engine and slag was found in the Y-dump strainer. The system was drained and fresh oil and filters were installed.

After the service of June 18, 1975, the vessel proceeded up the Ohio River and experienced engine problems and excessive vibration, causing it to be drydocked at Gallipolis, Ohio, on or about August 28, 1975. Prior to this time, on August 11, 1975, the lube oil filters were changed after approximately 823 hours of engine operation. In September, 1975, the engines and alignment were checked by B & Q. Mr. Balch, president of B & Q, stated that the alignment problems resulted from misalignment of the shafts by Mainstream, which opinion was confirmed by Captain Clark.

During the time that the vessel was in drydock, the vessel's engineers checked the engines and found them to be seriously damaged as a result of slag entering the system. National Marine Service sent its service engineer to the site and it was noted that all bearings of the engines were scarred with imbedded slag or foreign material and required replacement. Other elements of the engines needed replacement or repair.

On September 2–3, 1975, Mainstream was advised by telegrams of the events which had occurred during the past six weeks, including the extent of damage caused by the absence of oil filters and the required realignment of the tail shafts and engines. No response was made by Mainstream to these communications and no representative attended the vessel while in drydock.

The District Court found that the aforesaid repairs performed by National Marine and B & Q Machine & Repair, Inc., were necessitated by Mainstream's negligent failure to install oil filter elements in the lube oil systems of the two engines, to remove any welding slag left from its operation, and to align properly the intermediate and tail shafts. The Court found as a fact that the oil filter elements, which Mainstream was obligated to furnish, were not provided upon delivery of the vessel as repaired. Prior to the discovery of the absence of the filter elements no reason existed for their removal or inspection by crewmembers in view of protracted period when the boat was not in use. The Court also found as a fact that the intermediate and tail shafts and the engines aboard the JANE ELIZABETH were misaligned so as to cause excessive vibration during normal operations. Such misalignment, as well as the failure to install oil filter elements and to remove welding slag, constitute a failure to exercise ordinary care by Mainstream. The owner was awarded damages in the amount of $79,444.38.

 As an admiralty and maritime claim, this action falls within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. "In appeals of admiralty cases, as in other

appeals, the appellant has the burden of establishing that the district court's finding was clearly erroneous .... A finding is clearly erroneous when, although there is enough evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed and that the district court could not permissibly find as it did .... Questions of negligence in admiralty cases are treated as factual issues, and are thus subject to the clearly erroneous standard .... " *Noritake Company, Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 727, 728 (5th Cir., 1980).

■ On the facts, this was a close case, hard fought, the litigants on both sides having the benefit of able counsel who loaded the record with every conceivable fact, or inference to be drawn from such a fact, which might support their position. It was just such cases as this that gave birth to the clearly erroneous rule and which necessitate its continued use as a firmly entrenched part of our federal jurisprudence. This was just the kind of case which supports the rule that credibility choices must be left to the trier of the fact where he or she sees and hears the witnesses. It can make no difference that if we had been sitting in the first instance, *rather than in review,* we would have found the facts differently. This record will not allow us to confidently say that the District Court could not permissibly have found the facts as it did. Doubtful though we may be as to some of the factual aspects of the case, we do not have a firm conviction that a mistake has been made.

There was evidence that the oil filters were installed as they should have been. There was other evidence that they had not been installed. There were undisputed physical facts—when the boat began to malfunction and an investigation took place there were no filter elements and the engines were damaged in a manner which would have been caused by the absence of the elements.

Therefore, we must decline the invitation to overturn the factual findings entered by the District Court. Accordingly, this aspect of the judgment of the District Court is affirmed.

This, however, is not the end of the appeal.

## II

### *The Release*

■ On December 9, 1974, Emery Skelton, at that time the owner Vice-President, accepted the JANE T and signed a release discharging Mainstream from any cause of action for failure to comply with the contract. A copy of the release is made an appendix to this opinion.

The execution and delivery of the release, upon appropriate authority to do so, is not challenged. It recites that the M/V JANE T had been "repowered and refurnished pursuant to the terms of said contract and agreement" and that the "Buyer desires to accept possession of the M/V JANE T". The release acknowledges that repowering, refurnishing and delivery of the M/V JANE T is pursuant to the terms of said contract". Furthermore, the release discharges Mainstream from "any and all rights, claims, remedies or causes of action *of whatever nature* (emphasis added) for all damages arising from the failure, if any, of Seller to comply with the terms of said contract".

In its findings of fact the District Court noted the existence of the release but no mention is made of it in the conclusions of law. The Court was content simply to say that the complaint is "based on recovery for a tort and not a breach of contract", and concluded:

"The contract entered into by and between GMT and Mainstream on or about June 13, 1974, contained a disclaimer of any warranty of merchantability or any other warranty express or implied. Such disclaimer however, failed to negate any claims for negligence arising out of the performance under the contract and, therefore, such disclaimer may not serve as a bar to Gilco's action. *Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp.,* 519 F.2d 171 (5th Cir.

1975), *cert. den.*, 424 U.S. 954, 96 S.Ct. 1429 [47 L.Ed.2d 360] (1976)."

Mainstream vigorously argues that the release dated December 9, 1974 bars recovery, even for negligence or tort.

The plaintiff-appellee claims with equal vigor that this defense is cut off by our decision in *Jig The Third Corporation v. Puritan Marine Insurance Underwriters Corporation*, 519 F.2d 171 (5th Cir., 1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976), cited by the District Court.

Our first difficulty with this portion of the case is found in the fact that in its conclusion of law the District Court did not mention the release. It did not discuss it. It did not set forth the rationale by which it arrived at the legal conclusion that the principles fostered in *Jig* (over a cogent dissent) applied to a *release* after inspection. It may be that the District Court thought that the release was no bar, and we may infer that it rejected this defense because the judgment went against Mainstream. It is possible, however, that the District Court did not correctly consider the real impact of the release. The contract in *Jig* was one for the sale of a ship, not a release on repairs after inspection, in which the owner released the contractor of any and all rights, claims, remedies, or causes of action of whatever nature, as is the case presently before us.

It may be that such a release should not be enforced as to a concealed condition, i. e., the absence of filters which could not have been ascertained without, in effect, dismantling that part of the work. On the other hand, as to open and obvious matters which could be easily ascertained by a thorough inspection, such as the alignment of the shafts, it might be difficult to hold that the release did not cover that subject. If the release does not apply to the failure to install the oil filters, was the boat owner contributorily negligent in not sooner checking for the presence or absence of the filters? If so, did this enhance damage to the engines which otherwise would not have occurred? If so, what was the extent of it?

Since the District Court was silent as to the validity, consideration for, and applicability of the release, we do not see how we can perform that task at the appellate level.

*Conclusion*

We decline to disturb the findings of fact entered by the District Court and that action of the Court is affirmed.

We vacate that portion of the judgment of the District Court which awards damages against Mainstream and remand the case to allow the Court to decide the question of whether the release bars recovery and, if it does not, to determine the measure of damages as may be appropriate.

AFFIRMED IN PART AND VACATED and REMANDED IN PART.

APPENDIX

ACCEPTANCE AND RELEASE

WHEREAS, on or about June 13, 1974 Mainstream Shipyards and Supply, Inc. (hereinafter called Seller) and General Marine Towing Company, Inc. (hereinafter called Buyer) entered into a contract and agreement whereby Seller would repower and refurnish the M/V JANE T as per certain specifications set forth therein; and

WHEREAS, a copy of said Contract and Agreement is attached hereto as Exhibit "A" and made a part hereof as if fully copied verbatim herein; and

WHEREAS, the M/V JANE T has heretofore been repowered and refurnished pursuant to the terms of said Contract and Agreement; and

WHEREAS, Seller desires to deliver and Buyer desires to accept possession of the M/V JANE T.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:

That for and in consideration of the delivery of the M/V JANE T pursuant to the terms of the Contract and Agreement attached hereto as Exhibit "A", the Buyer does hereby accept the M/V JANE T, acknowledged that the repowering, refurnishing and delivery of the M/V JANE T is pursuant to the terms of said Contract and

**134**

Agreement and does hereby release, remise and forever discharge Seller, its agents, servants, employees underwriters, operators, managers, stockholders, successors and assigns of and from any and all rights, claims, liens, remedies or causes of action of whatever nature for all damages arising from the failure, if any, of Seller to comply with the terms of said Contract.

WITNESS the signature of General Marine Towing Company, Inc. by its duly authorized representative this the 9th day of December, 1974.

General Marine Towing Company, Inc.

By: s/ Emery Skelton

STATE OF MISSISSIPPI

COUNTY OF WASHINGTON

Personally appeared before me the undersigned authority in and for said county and state, EMERY SKELTON, who, being by me first duly sworn did state that he signed and delivered the foregoing instrument after having first obtained authority from General Marine Towing Company, Inc. and Gilco Marine Transport.

s/ Emery Skelton

SWORN TO AND SUBSCRIBED before me this the 9 day of December, 1974.

(Name Illegible)

Notary Public

My Commission Expires: 8/26/76