573 F.Supp. 896 (1983)
INGRAM RIVER EQUIPMENT, INC., Plaintiff,
v.
POTT INDUSTRIES, INC., Defendant.
No. 79-947 A (D).
United States District Court, E.D. Missouri.
September 30, 1983.
*897 *898 Goldstein & Price, Elmer Price, St. Louis, Mo., for plaintiff.
Thompson & Mitchell, Mary M. Bonacorsi, W. Stanley Walch, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision after a twelve-day trial on the merits. Since this is an admiralty case and within the Court's maritime jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1333, the Court heard the evidence without a jury. After considering the pleadings, testimony of the witnesses, stipulations of the parties and the various memoranda submitted on behalf of the respective parties, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact equally applicable as a conclusion of law is adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

Findings of Fact
1. Plaintiff Ingram River Equipment, Inc. (hereinafter Ingram) was and is incorporated under the laws of the State of Delaware having its principal place of business in the State of Tennessee. Defendant Pott Industries, Inc. (hereinafter Pott) was and is incorporated and has its principal place of business in the State of Missouri.
2. Pott is engaged in the business of building boats and barges through its St. Louis ship division. The barges which are the subjects of this action were operated by Ingram Barge Company, a division of Ingram Industries, Inc., under a bareboat charter. Ingram Barge Company has assigned its claim for damages in this cause to plaintiff Ingram.
3. On March 21, 1973, Ingram and Pott entered into a written contract for the construction of four tank barges. The price of construction for the barges was stated as One Million Nine Hundred Sixty Five Thousand Two Hundred Dollars subject to certain escalation charges.
4. The contract originally provided that only one barge, the IB3001B, would have a steam coil system for heating heavy liquid cargo. However, the parties later agreed to include such a system in all four barges.
5. Article IX of the contract contained warranties made by Pott. It provides, in pertinent part, that the barges will: (1) conform to the requirements of contract documents, the U.S. Coast Guard and the American Bureau of Shipping; (2) be of good workmanship and quality; and (3) be free of all defects. The warranty extended for six months after delivery to Ingram.
6. In March, 1975, Pott submitted plans and drawings (including bills of materials) to Ingram providing for the fabrication of the steam coil system with a combination of two-inch Sch. forty and Sch. eighty A.S. T.M. 53 furnace-weld (type "F" pipe), sometimes referred to as "butt weld pipe". Ingram approved the bills of materials calling for the use of furnace-weld pipe. The additional cost of installing the pipe was One Hundred Twenty Two Thousand Three Hundred Dollars ($122,300). The total price paid by Ingram to Pott, including extras and changes for the four barges was Two Million Three Hundred Ten Thousand Four Hundred Nineteen Dollars and Seventeen Cents ($2,310,419.17).
7. The evidence indicates that seamless pipe is considerably stronger than furnace-weld pipe. The A.S.T.M. A-53 standards for two-inch Sch. forty and Sch. eighty furnace-weld pipe required such pipe to *899 withstand hydrostatic fluid test pressures of up to one thousand p.s.i.g. (per square inch) and thirteen hundred p.s.i.g. respectively. The A.S.T.M. A-53 standards for two-inch Sch. forty Grade A seamless pipe require such pipe to withstand hydrostatic test pressures up to twenty three hundred p.s.i.g. The A.S.T.M. A-53 standards for two-inch Sch. forty Grade B seamless pipe requires such pipe to withstand hydrostatic test pressures up to twenty five hundred p.s.i.g.
8. The parties dispute whether defendant represented to plaintiff that furnace-weld pipe would be "just as good as" seamless pipe. The Court finds, however, that Ingram relied upon Pott's reputation as a shipbuilder and that Pott held itself out as an expert in this field. Additionally, Article IV(a) of the contract provides in pertinent part:
The detailed manner and method of performing work shall be under the control of seller (Pott), buyer (Ingram) being interested only in the results obtained.
9. Seamless and furnace-weld pipes of the same size and made from the same grade of steel are manufactured differently. Seamless pipe is manufactured in a continuous circumference without a seam; furnace-weld has a vertical seam which is joined together by welding in the manufacturing process. The use of both types of pipe and the fabrication of steel coils complies with the regulations of the United States Coast Guard applicable to the design and construction of steam coil heating systems in tank barges. Generally, seamless is more expensive than furnace-weld pipe.
10. Both Ingram and the United States Coast Guard approved the final bills of materials, plans and drawings of the steam coil heating systems in the barges. The heating systems were then installed by Pott in each of the four Ingram barges in conformity with the final material specifications, plans and drawings. An Ingram representative was present at Pott's shipyard during construction of the four barges.
11. Prior to delivery, Pott hydrostatically tested the steam coils in each barge and then purged the coils. The United States Coast Guard inspected each barge and issued its Barge Certificate of Inspection for each barge.
12. In August, 1977, splits, cracks and leaks were discovered in a number of the steam coils when one of the barges, IB2702T, was at the Avondale shipyards for hull repairs. The coils had not been used prior to this time because the barges only carried "light" cargo, such as gasoline, that did not require heat to be used to facilitate the pumping process. Ultimately, thirty five splits were found in the coils of barge IB2701L, seventy one splits in the coils of barge IB2702T, and fifty seven splits were found in the coils of a barge IB3001B. Splits were not found in the coils of the IB1501B at that time, although some splits were discovered later. Pott sent representatives to Avondale to examine the pipe after the steam coils had been repaired.
13. Following the initial repairs, Ingram continued to experience problems with leakage from the steam coils. In the Fall of 1978, Ingram decided to replace the steam coils in all four barges and to make certain design changes. Ingram contracted for the work to be done at Avondale after obtaining bids from Pott and Avondale. The barges were kept at Avondale from December 5, 1978 until February, 1979 for replacement of the steam coil system.
14. The parties agree that water freezing in the coils was most probably the immediate cause of the splits, cracks and leaks discovered in the steam coil systems of the Ingram barges. In normal operations, steam is introduced into tank barge heating coils to heat heavy liquid cargo sufficiently to permit the cargo to flow freely for pumping. Following the introduction of steam into the coils, normal operating procedures required that the coils be purged in order to remove the water accumulated during steaming. The design of the Ingram barges provided for purging *900 by means of blowing compressed air through the coils to discharge the water. Water is also introduced from time to time in steam coils for testing. At other times coils are tested by introduction of air.
15. Both parties have introduced a substantial degree of expert testimony. The expert witnesses have performed numerous tests with different models of the steam coil heating system under a variety of conditions. Despite this impressive array of technical expertise, however, the central issue remains what quantity of water was necessary to rupture the furnace-weld pipe as it was designed in defendants' steam coil heating system.
16. Defendant argues that the pipes had to be substantially full of water before ruptures occurred. If this condition existed, the evidence indicates that regardless of the design of the system or whether seamless or furnace-weld pipe was utilized, the pipes would have burst. Further, defendant contends that the only party possibly responsible for filling the system with water would be the plaintiff. This is necessarily so because defendant hydrostatically tested the pipes only once and both parties have stipulated that the pipes were purged at that time. However, the Court finds that the extent and efficiency of the purging process was never tested by defendant.
17. Plaintiff's position is that the pipes need not have been substantially filled with water to rupture. Plaintiff argues that a relatively small amount of water left in the system could form pockets. These pockets of water would then freeze causing a rupture. However, only that portion of the water closest to the pipes surrounded by the freezing air would freeze, while water closest to the pipes surrounded by the petroleum product would remain liquid and, therefore, harmless to the pipe. This theory explains the apparently random ruptures in the coil since the movement of the barge would cause the water to be collected at various points which would then break when exposed to the freezing temperatures. Under plaintiff's theory, the efficiency of the purging process, as well as the design of the coils, becomes critical. If the water is not sufficiently purged by compressing air through the system, the pipe will rupture. Plaintiff argues that the purging process is ineffective to remove all of the water because the compressed air simply seeks the path of least resistance and blows over the low points in the pipes. Plaintiff also contends that the design of coils decreased the efficiency of the purging process.
18. The preponderance of the credible evidence indicates that plaintiff's theory is correct. Not only does plaintiff's theory explain the random ruptures in the pipes, it also explains why further ruptures occurred only in the furnace-weld pipes after the pipes were repaired in the Avondale shipyards in 1977. Additional support for this theory is provided by the fact that Ingram experienced no further problems with the barges after recoiling the heating system with seamless pipe and implementing design changes to improve the purging process. The Court therefore finds that defendant was negligent in its design of the steam coil heating system and in its choice of furnace-weld pipe in the construction of the system.
19. With respect to the purging process itself, this Court finds that plaintiff's estimates concerning the amount of water left in the system after purging are more credible. Plaintiff's tests showed that between twenty per cent (20%) to thirty per cent (30%) of the water injected into the pipes remained after purging. The discrepancy in plaintiff's tests is explained by the fact that tests performed within the context of actual operating conditions yielded higher percentages of water retention. Defendant's tests, in contrast, were performed under optimal conditions on land, thus eliminating the rolling motion of an operating barge. Nevertheless, a number of defendant's tests revealed that water was retained in the coils. The Court therefore finds that defendant was negligent in failing to test the purging efficiency of the steam coil heating system.

*901 Conclusions of Law

The Court has jurisdiction of this cause under maritime law. It is undisputed that the steam coils split while the barges were operating on navigable waterways and employed in the business of transporting commerce. Thus, there is maritime locality and a significant relationship to a traditional maritime activity. See Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 268, 93 S.Ct. 493, 505, 34 L.Ed.2d 454, 467 (1972). This is true even though the conduct alleged is negligent construction or defective design and may have occurred ashore. Jig the Third Corp. v. Puritan Marine Ins. Underwriter Corp., 519 F.2d 171, 174 (5th Cir.1975), cert. denied 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).
Defendant argues that because the only damage sustained by plaintiff was economic loss, recovery should be denied. Defendant bases this contention on the holding in R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818 (8th Cir.1983). In this case, after a review of Missouri law, the Eighth Circuit Court of Appeals ruled that Missouri law requires something more than economic loss, i.e., damage to the property itself to state a cause of action in negligence. The court concluded that there must be personal injury or property damage either to property other than the property sold, or to the property sold when it was rendered useless by some violent occurrence. Id. at 828-29.
Missouri law thus delineated, this Court must determine whether it should be applied in a tort action grounded in maritime law. One of the basic precepts of maritime law is that it is a federal law and, thus, should be applied in a uniform manner. Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631 (8th Cir.1972). It has been held that negligent construction of a vessel states a claim under maritime law. See Jig the Third Corp. v. Puritan Marine Ins. Underwriter Corp., 519 F.2d 171 (5th Cir.1975). Moreover, a number of courts have agreed that negligent repair of a vessel states a claim for negligence under maritime law. See, e.g., General Intermodal Logistics v. Main Stream Shipyards, 666 F.2d 129 (5th Cir.1982); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46 (5th Cir.), cert. denied 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1967); Houston-New Orleans, Inc. v. Page Engineering Co., 353 F.Supp. 890 (E.D.La.1972).
The Court has considered the interest of Missouri in having the contract considered under its laws, but finds that the need for uniformity in federal maritime law is overriding. Therefore, Missouri law restricting negligence actions to those situations where damages other than economic loss is alleged cannot be followed.
Plaintiff in this cause alleges that defendant negligently designed the steam coil heating system of the Ingram barges in that the coils could not be properly purged. Negligent design of a vessel states a claim under maritime law. Sears, Roebuck & Co. v. American President Lines, Ltd., 345 F.Supp. 395 (N.D.Cal. 1971). Plaintiff has also alleged that defendant failed to use proper care in the material chosen to construct the heating system, i.e., the use of furnace-weld pipe. This also has been acknowledged as stating a cause of action under maritime law. See Jig the Third Corp. v. Puritan Marine Ins. Underwriter Corp., 519 F.2d 171 (10th Cir.1975). The Court has found that plaintiff has sustained its burden of proof in this matter and, accordingly, finds for plaintiff on this count of his claim.
Plaintiff has also alleged and proven that defendant failed to adequately test the purging procedure whereby condensate was to be removed from the steam coil heating system. Defendant had this duty. Watz v. Zapata Off-shore Co., 431 F.2d 100, 119 (5th Cir.1970).
Plaintiff also contends that the Court should find defendant strictly liable in its construction of the Ingram barges. The Court cannot agree with this assertion. A number of Circuits, including the Eighth Circuit, have expressly recognized the doctrine of strict liability as a part of federal *902 maritime law. See e.g., Pan Alaska Fisheries, Inc. v. Marine Const. & Design Co., 565 F.2d 1129 (9th Cir.1977); Lindsay v. McDonnell Douglas Aircraft Corp., 460 F.2d 631 (8th Cir.1972); Shaeffer v. Michigan-Ohio Navigation Co., 416 F.2d 217 (6th Cir.1969); McKee v. Brunswick Corp., 354 F.2d 577 (7th Cir.1965). However, two elements of strict liability as it is stated in § 402(a) of the Restatement of Torts and as it has been developed in the Circuit Court decisions are that the product be unreasonably dangerous and that physical harm occur. These conditions are not extant in the present cause. Therefore, strict liability will not provide plaintiff with an alternate theory of recovery.
The second count of plaintiff's complaint sounds in contract theory. Plaintiff argues that defendant breached an implied warranty of fitness for a particular purpose. Mo. Rev.Stat. § 400.2-315 states:
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods will be fit for such purpose.
Furthermore, any exclusion or modification of the warranty of fitness must be in writing and conspicuous. Mo.Rev.Stat. § 400.2-316.
Two provisions of the contract between the parties are particularly pertinent with regard to this count of plaintiff's claim. The first provision, in Article 4(a), states:
The detailed manner and method of performing work shall be under the control of seller (Pott), buyer (Ingram) being interested only in the results obtained.
From this provision, it is clear that plaintiff relied upon defendant's judgment in selecting suitable material for the construction of the steam coil heating system. The second provision, in Article 9 of the contract, created the warranties between the parties. It stated only that the barges would conform to certain minimum objective requirements, be of good workmanship and quality, and be free of all defects. It does not exclude any implied warranties.
Plaintiff cites Singer Co. v. E.I. du Pont de Nemours & Co., 579 F.2d 433 (7th Cir. 1978), as support for its proposition that plaintiff breached its implied warranty of fitness. In this case, the defendant, du Pont, contracted to provide plaintiff Singer with paint for an electro-disposition paint system. The paint provided failed to adequately perform its function and both the trial court and the appellate court ruled that the defendant had breached its implied warranty of fitness.
Defendant argues that Singer is not controlling in this cause because the furnace-weld pipes supplied to plaintiff were not intended for a particular purpose. The Court cannot agree with this contention. Defendant did not simply provide pipe for plaintiff, it provided pipe to be used in a steam coil heating system. Such a system requires the pipe to withstand a severe increase in temperature when the coils are heated by steam to facilitate the transfer of cargo, and a dramatic drop in temperature when the pipes are not being used and the vessel ventures into colder climates during winter. The pipe must also be able to withstand great pressure when steam is introduced into the system and when the condensate is purged from the system by means of high pressure air. The pipe therefore had to be manufactured with these characteristics in mind to adequately serve its intended purpose.
Defendant can hardly argue that it was unaware of the purpose of the pipe because defendant constructed the barges. Moreover, under the terms of the contract, defendant cannot convincingly argue that plaintiff did not rely on defendant's skill in choosing the material. Defendant's choice of material, as already noted, failed to function adequately for its particular purpose as a steam coil heating system. Thus, this Court concludes that defendant breached its implied warranty of fitness.
*903 Plaintiff also argues that defendant breached an implied warranty of merchantability. The Court disagrees. Mo.Rev. Stat. § 400.2-316, comment 9, states:
The warranty of merchantability in such a transaction, however, must be considered in connection with the next section on the cumulation and conflict of warranties. Under paragraph (c) of that section in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will carefully comply with the specifications.
Mo.Rev.Stat. § 400.2-317(c) states:
Express warranties displace inconsistent implied warranties other than a warranty for a particular purpose.
A portion of the express warranty stated that the barges would conform to the requirements of contract documents. Thus, this express warranty would displace the warranty of merchantability, but not the warranty of fitness for a particular purpose analyzed above.
Plaintiff also brings a claim under express warranty. Plaintiff alleges that Anthony Tobin, defendant's Vice President of Sales, had stated that furnace-weld pipe was "just as good" as seamless pipe. Plaintiff argues that this statement became part of the basis of the bargain and must be considered an express warranty. Community Television Services v. Dresser Industries, 586 F.2d 637, 640 (8th Cir.1978). Defendant vigorously disputes that Tobin ever made such a statement.
The Court cannot agree with plaintiff's contention. In Community Television, the court found that a written sales catalogue circulated by the defendants and stating that its "television towers would safely withstand the maximum wind velocities and ice loads to which they are likely to be subjected", created an express warranty beyond that stated in the contract. Although somewhat analogous to the present cause, the Court cannot find that a statement allegedly made by one of defendant's officers while the barges were already being constructed could rise to the level of an express warranty. Therefore the Court does not find defendant liable under a violation of express warranty.
Plaintiff sues for the cost of the initial repairs at Avondale, the cost of the subsequent recoiling of the barges, the loss of use of the barges while they were being repaired, and for prejudgment interest.
Defendant argues that Ingram had a duty to minimize the cost of correcting the situation and cites cases in support of its proposition. Todd Shipyards Corp. v. Turbine Service, Inc., 467 F.Supp. 1257 (E.D.La.1978); Monsanto Co. v. Port of St. Louis, 350 F.Supp. 502 (E.D.Mo.1972). Defendant contends that simple repairs would have been sufficient to correct the situation. However, because the Court has found that the design and the material were negligently defective, defendant's contention is irrelevant. All of the barges would necessarily have to be recoiled to eliminate these defects.
The Court finds that plaintiff's proof for loss of use of the barges during the time that they were being recoiled at Avondale is too speculative to be awarded. Plaintiff's witness in this regard Mr. Val Slicho, Vice President in charge of Petroleum Sales and Transportation, testified that Ingram had received inquiries for rate quotes on a New Orleans to Pittsburgh trip. Based on these inquiries and using the "going rate" of 5.5 mils per ton miles, Mr. Slicho arrived at the figure for loss of use.
The standard for determining loss of use is too rigid to warrant allowing a judgment on such speculative opinion. In Cargill, Inc. v. Taylor Towing Service, Inc., 642 F.2d 239 (8th Cir.1981), the court noted that:
To warrant a recovery for lost profits, the plaintiff must present proof sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts. (citations omitted). As an element of recoverable damages, the sufficiency of the evidence *904 of lost profits is dependent upon whether the financial information contained in the record is such that a just or reasonable estimate can be drawn.
Id. at 241. The record simply fails to offer sufficient proof in this cause to justify an award for loss of use.
Prejudgment interest will be awarded. Prejudgment interest is awarded whenever damages lawfully due are withheld absent a showing of exceptional circumstances that would justify the refusal. Id. at 242.
In conclusion, the Court finds that plaintiff has proven its claim in maritime tort for negligent design of the steam coil heating system; negligent choice of material for construction of the system; negligent failure to test the purging capacity of the system; and for a breach of the warranty of fitness for a particular purpose. Accordingly, judgment will be for plaintiff.